Compagnie Francaise de Navigation a Vapeur vs. State Board of Health, et als.

---

## No. 13,076.

COMPAGNIE FRANCAISE DE NAVIGATION A VAPEUR VS. STATE BOARD OF HEALTH, ET ALS.

### SYLLABUS.

The General Assembly of this State, in enacting Act No. 192 of 1898, creating a State Board of Health and defining its powers and duties, was not acting or claiming to act under "a power to regulate commerce," as the source from which it derived the right to pass the act. Its source was the police power of the State, exercised for the protection and preservation of the public health.

Section 8 of the act, authorizing the State Board of Health, at its discretion, to prohibit the introduction into any infected portions of the State of persons, acclimated, unacclimated, or said to be immune, when in its judgment the introduction of such persons would add to or increase the prevalence of the disease, is not unconstitutional as infringing upon the right and power of Congress to regulate commerce, or in contravention of treaties with France and Italy, or of the immigration laws of the General Government, or of any rights secured by the fourteenth amendment of the Constitution of the United States. (*In re* Rahrer, 140 U. S., 554; Gibbons vs. Ogden, 9 Wh. 203.)

Nor is the Act No. 192 of 1898, unconstitutional as violative of Article 31 of the State Constitution of 1898, which declares that "every law enacted by the General Assembly shall embrace but one object, and that shall be expressed by its title." The authority to the Board of Health to prohibit the introduction into any infected portion of the State of persons acclimated, unacclimated, or said to be immune. from coming on shipboard from any foreign countries and ports whether infected or not, when in the judgment of said Board the introduction of such persons would add to or increase the prevalence of the disease, could very legitimately be referred to

several clauses of the title of the Act. It would be very properly covered by its declared object of "carrying into effect Article 296 of the Constitution of the State, providing for the establishment and organization of a State Board of Health, and defining the power, duty and authority of said Board"; or its object "of protecting and preserving the public health," or "of authorizing the regulation of the isolation of infectious and contagious diseases." (Allopathic State Board vs. Fowler, 50 Ann., 1358; 23 Am. & Eng. Encyc. of Law, p. 229 et seq.; Cooley's Const. Lim., 175; State vs. Crowley et als., 33 Ann., 783; State vs. Dalon, 35 Ann., 1141; American Printing House Co. vs. Dupuy, 37 Ann., 188.)

ON APPEAL from the Civil District Court for the Parish of Orleans. Monroe, J.

Howe, Spencer & Cocke for Plaintiff and Appellant.

F. C. Zacharie for Defendants, Appellees.

Argued and submitted February 20, 1899.
Opinion handed down March 23, 1899.

This case is pending on Writ of Error before the Supreme Court of the United States.

The opinion of the court was delivered by

NICHOLLS, C. J. This case is before us on an appeal by the plaintiffs from a judgment of the Civil District Court, sustaining an exception of no cause of action, filed by the defendants, and dismissing their suit.

Plaintiffs' demand is set out in two petitions.

In the first of these petitions they alleged that they were a corporation created by and existing under the laws of the Republic of France, and the owner of a large number of steamships, and were engaged in the business of transportation of freight and passengers for hire from various ports on the Mediterranean Sea to various ports in the United States, and more particularly to the port of New Orleans. That petitioners were more particularly the owners of the steamship "Britannia," which was engaged in the transportation of freight and passengers between the ports of Palermo and Messina, Italy, and the port of New Orleans, in the State of Louisiana.

That the defendant, the State Board of Health, was a body created by Act No. 192 of the General Assembly of the State of Louisiana, of

the year 1898, with power to sue and be sued, domiciled in this city and composed of seven members, whose duty it was by the provisions of said act to protect and preserve the public health by preparing and promulgating a sanitary code for the State of Louisiana, by providing for the general sanitation of the State, and with authority to regulate infectious and contagious diseases, and to prescribe a maritime and land quarantine against places infected with such diseases.

That the other defendants to their suit, to-wit: Edmond Souchon, Hampden S. Lewis, and Charles A. Gaudet, were members of said Board, and residents and citizens of the parish of Orleans.

That in the course of petitioners' said business of transporting freight and passengers from ports on the Mediterranean sea to ports in the United States, petitioners caused their steamship "Britannia," on or about the second day of September, 1898, to be cleared from the ports of Palermo, Italy, and Marseilles, France, for the port of New Orleans, with a cargo of about one hundred tons of general merchandise, and with about four hundred and eight passengers; said freight being destined for the port of New Orleans, State of Louisiana, and some of said passengers were persons designing and intending to enter the United States through the port of New Orleans for the purpose of settling in the State of Louisiana and adjoining States, and some were citizens of the United States and residents of the State of Louisiana, who were returning to their homes.

That said passengers were in all respects, at said time, and ever since, free from infectious or contagious diseases of any kind, and were free from any such diseases at the time of the arrival of said steamship at the quarantine station established by the defendant, the State Board of Health, some distance below the city of New Orleans, on the Mississippi River, about eight o'clock a. m., on the twenty-ninth (29th) day of September, 1898. That on the same day, in accordance with the regulations of said defendant, the State Board of Health, said vessel was regularly inspected and her freight and passengers examined by the officers of the said Board of Health, and it was found that her passengers and cargo were entirely free from any infectious or contagious disease, or from any disease which was likely to affect the health of the people of New Orleans, or the State of Louisiana, and accordingly, she was given a clean bill of health.

That notwithstanding this fact, and although under the rules and regulations of said defendant, the State Board of Health, said vessel

should have been permitted to at once proceed to her destination at the port of New Orleans, and there to discharge her cargo and passengers, and notwithstanding that her said cargo and passengers continued free of all infectious or contagious disease, or any disease likely to affect the health of the people of said city or State, and although said vessel had complied with all the regulations of said Board, said State Board of Health, on the twenty-ninth (29th) day of September, 1898, at a session convened at its office in the city of New Orleans, whereat the following members were present, voting affirmatively and assenting to it: Edmond Souchon, Charles A. Gaudet and Hampden S. Lewis, passed a resolution prohibiting, in effect, the said vessel from coming into the port of New Orleans, and there discharging its passengers, certified copy of which resolution they annexed and made part of their petition. That, in pursuance of this resolution, Dr. Edmond Souchon, President of the State Board of Health, served a notice on the agents of petitioner, (James Sawyers & Son) prohibiting the landing of said steamship at the port of New Orleans, and at the various other places mentioned therein, for the purpose of discharging said passengers, and, subsequently, the president of said State Board of Health notified the agents of petitioner, that if they attempted to land said passengers at any place contiguous to the port of New Orleans, not at that time quarantined, that quarantine would, at once, be established at such place, and that said passengers would not be allowed to land there. That said prohibition virtually applied to all the territory within one hundred miles of the port of New Orleans, and in effect debarred said steamship from landing at any place in the State of Louisiana for the purpose of discharging said passengers, and petitioners annexed and made a part of their petition, the notice as received from said State Board of Health.

They averred that while said resolution, on its face, purported to be general in its character, that as a matter of fact same was passed for the specific purpose of prohibiting and preventing said steamship "Britannia" from landing in the State of Louisiana, and discharging said pasengers therein; inasmuch as for some time prior thereto, and even subsequent to the passage of said ordinance, said Board of Health had permitted large bodies of persons coming directly from the same ports in Italy and Sicily *via* the port of New York, to be brought into the city of New Orleans by various railroad companies, and ever since the promulgation of said ordinance more than two

hundred such persons, varying in groups of from thirty to one hundred in number, had, from time to time, been permitted to enter said city.

That said State Board of Health pretended to base its right to thus exclude persons in good health and not affected with any contagious or infectious disease from the port of New Orleans and neighboring territory, upon the authority of said Act No. 192 of 1898, and especially under the following portion of Section eight (8) of said Act, to-wit:

"The State Board of Health, in its discretion, may prohibit the introduction into any infected portion of the State of persons acclimated, unacclimated or said to be immune, when in its judgment the introduction of such persons would add to or increase the prevalence of the disease."

That said portion of said section eight (8) of said Act No. 192 of 1898, did not confer upon the State Board of Health the right to exclude healthy persons from coming from various foreign ports into the port of New Orleans, as pretended by them, and if said section did so confer upon said Board said pretended right and authority, same was in violation of the Constitution of the United States, inasmuch as it was an attempt on the part of the State of Louisiana to regulate or prohibit commerce from foreign countries into the United States, or to authorize the regulation or prohibition thereof by said Board, and was especially in contravention of Article 1, paragraph eight (8), section three (3), thereof, which provided that Congress shall have exclusive power to regulate commerce with foreign nations and among the several States; and petitioners specially pleaded and claimed the benefit and protection of said provision of the Constitution.

Petitioner averred that this arbitrary and illegal action of the State Board of Health and the individual members thereof, by detaining said vessel at the quarantine station and preventing her from proceeding to the city of New Orleans and there discharging her passengers and cargo, had caused great damage, and was causing and would continue to cause petitioners further damage to an amount of more than five hundred dollars, for every day that said vessel was prohibited from discharging said passengers, for the reason that by law and by contract, petitioners were compelled to furnish said passengers with lodging and with food, and besides, were subjected to a heavy expense in the way of wages for its crew and officers, and

various other and sundry expenses which they would not be compelled to suffer were they permitted to land said vessel and discharge its passengers and cargo as they had a right to do. That said arbitrary and illegal action of said Board and the members thereof would cause petitioners to suffer heavy damages in the way of loss of business, for the reason that the agents of said steamship in the city of New Orleans had procured for and bound said ship to receive a large and complete cargo of freight destined for ports in Europe, for all of which damage the defendants were liable *in solido* to petitioners. That by reason of said arbitrary and illegal action of said board and the members thereof, petitioners had already suffered damages from the cause aforesaid, in the sum of twenty-five hundred dollars, and they reserved their right to amend their petition and claim of said Board and the members thereof *in solido* any further damage which they might suffer in the premises.

That unless said State Board of Health be restrained by the court it would persist in its illegal and arbitrary refusal to permit said steamer to land said passengers in the city of New Orleans, to the great and irreparable injury of petitioners, and petitioners averred that for the protection of their rights in the premises they were entitled to and desired a writ of injunction directed against the said Board of Health, its officers, and agents, prohibiting and enjoining them and each of them from interfering with or preventing the landing of said steamship at the port of New Orleans, and from unloading and discharging its passengers.

In view of the premises petitioners prayed that said State Board of Health, its president, and said Edmond Souchon, Hampden S. Lewis and Charles A. Gaudet, be cited; that a writ of injunction issue directed to said Board of Health, enjoining and prohibiting it and its officers, agents and employees, and each of them, from enforcing said resolution or ordinance of said Board, of date twenty-ninth (29th) September, 1898, or from prohibiting or interfering, in any manner, with petitioners' bringing their said steamship "Britannia" to the port of New Orleans, and there discharging its passengers and cargo; that there be judgment in favor of petitioners and against said State Board of Health and Edmond Souchon, Hampden S. Lewis and Charles A. Gaudet *in solido* in the full sum of twenty-five hundred dollars damages, with legal interest from judicial demand, and reserving unto petitioners the right to claim from said defendants any

FIFTY-FIRST ANNUAL REPORTS, 1899.        651

Compagnie Francaise de Navigation a Vapeur vs. State Board of Health, et als.

further damages which they might thereafter be caused by their said illegal acts; that said portion of section 8 of said Act No. 192 of 1898, set forth, be declared null and void, as being in contravention of the Constitution of the United States, and that said writ of injunction be made perpetual.

In the second of these petitions, they alleged that since the filing of the original petition they had suffered additional damages as thereinafter set forth in a sum exceeding eight thousand, five hundred dollars, for which, for the reasons set forth in their original petition, and in said second petition, the defendants were liable to them *in solido*— that said damage was occasioned by reason of the illegal, unjust, and arbitrary action aforesaid of said State Board of Health, and said individual members thereof in the exclusion from the city and port of New Orleans of said vessel and passengers, some of whom were subjects of the King of Italy, entitled to the protection of the treaties between said sovereign and the United States, and who intended to avail themselves of the laws of the United States regulating immigration by entering the State of Louisiana to establish residence in said State or adjoining States. That said immigrants and other passengers were so excluded and prevented from landing, notwithstanding the fact that said steamer Britannia had complied with all the laws of the United States regulating commerce with foreign nations, quarantine and immigration into the United States, and notwithstanding that said immigrants were coming from ports which were not infected with any contagious or infectious disease, and were not themselves infected with any such disease, but were, at the time of their departure, and at all times thereafter, free from any infectious or contagious diseases, or diseases that were likely to affect the public health of the citizens of New Orleans, or State of Louisiana, and were, under the immigration laws, entitled to enter. That petitioners had no notice of the intended action of the defendant in so prohibiting the landing of said passengers and immigrants until the arrival of their steamer "Britannia" at the port of New Orleans, said steamer having sailed prior to the declaration by said Board of the existence of an infectious disease in the city of New Orleans.

That by reason of the illegal and arbitrary conduct of the defendants, petitioners were compelled for many days to keep said vessal moored in the river below the city of New Orleans, with all of its said pasengers, crew and cargo aboard. That as said defendants persisted

652 SUPREME COURT OF LOUISIANA.

Compagnie Francaise de Navigation a Vapeur vs. State Board of Health, et als.

in their said illegal and arbitrary refusal to permit the landing of said immigrants and passengers, in order to minimize as much as possible its damages, petitioners were compelled to send their said steamer to the port of Pensacola, Florida, which was the nearest available port to the port of New Orleans, and there disembark said immigrants and passengers, and thereafter to cause their said steamer to return to the port of New Orleans to discharge its cargo. That said voyage to and from Pensacola, from and to New Orleans, so occasioned, caused a loss of time to said vessel, even with the utmost dispatch, of more than three weeks. That during the illegal detention of said vessel in the Mississippi River, and during the voyage to Pensacola, and while in said port, petitioners were at great expense in the maintenance and care of said immigrants, passengers and crew of said vessel. Moreover, petitioners suffered great damages, as would be shown on the trial of the case, in the way of extra wages of officers and crew, extra fuel and supplies consumed on said voyage between New Orleans and Pensacola, as well as during the said illegal detention, extra compensation to its agents in this city of New Orleans and at Pensacola, cablegrams and other expenses. Furthermore, petitioners had suffered large damages by reason of the fact that said vessel thus lost more than twenty-one days on the voyage from her home port and return, which delay occasioned petitioners a large loss both of business and profits, and the damages thus occasioned to petitioners by said illegal and arbitrary action of said defendant exceeded in the aggregate the sum of eleven thousand dollars, and said damages were caused solely by said illegal and arbitrary action of said Board, and not otherwise. That said action of said defendants in prohibiting the entrance and landing of said passengers and immigrants in the port of New Orleans and the State of Louisiana, was moreover in violation of the laws of the United States and the rules and regulations made in pursuance thereof relating to quarantine at and immigration from foreign countries into ports of the United States, and especially acts of Congress approved February 15th, 1893, and the rules and regulations made in pursuance thereof; and acts of Congress of March 3rd, 1882, and June 26th, 1884, and the rules and regulations made in pursuance thereof, and of the treaties existing between the United States, on the one part, and the Kingdom of Italy and the Republic of France, on the other part, and petitioners specially pleaded and claimed the benefit of said acts and treaties.

The premises considered, petitioners prayed that defendants be cited; that there be judgment in favor of petitioners and against the said defendants as in their original petition prayed for, and further, that there be judgment in favor of petitioners and against the defendants *in solido* in the full sum of eleven thousand dollars, with legal interest from judicial demand.

Annexed by plaintiffs to their petition was a copy of the resolution of the Board of Health, and of the notice served upon plaintiffs, which they had referred to in their pleadings.   The notice reads as follows:

"Louisiana State Board of Health,

"September 29th, 1898.

"Messrs. Jas. Sawyers & Son,

"Agent S. S. Britannia, New Orleans, La.

"Gentlemen:—Referring to the detention of the S. S. Britannia at the Miss. River Quarantine Station, with 408 Italian immigrants on board, I have to inform you that under the provisions of the new State Board of Health Law, Section 8, of which I enclose a marked copy, this Board has adopted a resolution forbidding the landing of any body of people in any town, city or parish in quarantine.   Under this resolution the immigrants now on board the Britannia cannot be landed in any of the following parishes of Louisiana, namely, Orleans, St. Bernard, Jefferson (right bank), St. Tammany, Plaquemines, St. Charles, or St. John.   You will therefore govern yourself accordingly.

"Respectfully,

(Signed)                    "EDMOND SOUCHON, M. D.,

"President Louisiana State Board of Health."

The resolution read as follows:

"Resolved, That hereafter, in the case of any town, city or parish of Louisiana being declared in quarantine, no body or bodies of people, immigrants, soldiers, or others, shall be allowed to enter said town, city or parish, so long as said quarantine shall exist, and that the president of the Board shall enforce this resolution."

## OPINION.

At the time of the adoption of the Constitution of 1898, there existed in the State of Louisiana, a State Board of Health, with powers and duties defined and fixed by law.

Article 296 of that Constitution directed that the General Assembly

should create for the State, and for each parish and municipality therein, Boards of Health, and should define their duties and prescribe the powers thereof.

On the 14th of July, 1898, the Governor of the State approved Act No. 192, enacted by the General Assembly at the session of 1898. The act was entitled "An act to carry into effect Article 296 of the Constitution of the State of Louisiana, in relation to Boards of Health; to protect and preserve the public health; to provide for the establishment and organization of a State Board of Health and parish and municipal Boards of Health; to define the powers, duty and authority of said Boards; to provide for the appointment and election of officers, and employees of said Board; to authorize the State Board to prepare and promulgate a sanitary code for the State of Louisiana, and fixing penalties for the violation thereof; to provide for the general sanitation of the State, and a local sanitation of the parishes and municipalities; to authorize the regulation of the isolation of cases of infectious and contagious diseases, and a maritime and land quarantine against places infected with such diseases; to repeal all laws and parts of laws, special and general, in conflict with the provisions of this act; and to provide for the succession of the Boards created by this act to all powers, authority, rights, claims and property of the present Boards."

By the second section of the act the duties and powers of the president, and secretary, and treasurer of the State Board were declared to be those incident to like officers in similar corporations, and also such other powers and duties as then devolved by law upon their predecessors in the existing Board, as well as those additionally prescribed by the provisions of the act. In addition to said powers and duties already prescribed by existing laws, the president was granted the power after the adjournment of the Board, and during the interval of time between the meetings of the Board, and when the Board was not in session, to issue all orders and warrants and to take all necessary steps to execute the sanitary laws of the State and to carry out the rules, ordinances and regulations of the Board made therein, and in his discretion, to call special meetings of the Board, whenever, in his opinion, an emergency should require it.

By the third section, the Board was granted all the powers, authority and jurisdiction then possessed by the existing Board of

FIFTY-FIRST ANNUAL REPORTS, 1899.     655

Compagnie Francaise de Navigation a Vapeur vs. State Board of Health, et als.

Health under the laws then in force, except in so far as modified and changed by the provisions of the new law.

It was given exclusive jurisdiction, control, and authority, over maritime quarantine within the State, as then provided by existing laws.

It was also given supervisory power over land quarantine and over the care and control of infectious and contagious diseases within the State, in order to accomplish the subsidence and suppression thereof, and to prevent the spread of the same; such supervision and control was directed to be exercised in the manner and to the extent laid down in the act.

By the eighth section, it was enacted, that in case any parish, town, or ctiy, should become infected with any contagious or infectious disease, to such an extent as to threaten the spread of such disease to other portions of the State, the State Board of Health was directed to issue its proclamation declaring the facts and ordering it in quarantine, and to order the local Boards of Health in other parishes, towns, and cities, to quarantine against said locality, and it was further directed to establish and promulgate the rules and regulations, terms, and conditions, on which intercourse with said infected locality should be permitted.

The State Board of Health was authorized, at its discretion, to prohibit the introduction into any infected portions of the State of persons, acclimated, unacclimated, or said to be immune, when in its judgment the introduction of such persons would add to or increase the prevalence of the disease.

Plaintiffs contend that the State Board of Health requires that the court should read in the eighth section of Act No. 192, of 1898, a grant of authority to prohibit the introduction into the State of healthy persons coming from places not infected with infectious or contagious diseases.

In their brief they say: "If this was the intention of the legislature, why did it express its objects to be 'to authorize a maritime and land quarantine' against places 'infected' with contagious or infectious diseases? If an authority was intended to be given to establish maritime quarantine against any place whatsoever, without reference to the existence of disease there, the Legislature would certainly not have qualified the noun 'places,' by the adjective 'infected.'

"It is clear that the effect of that adjective is to qualify and make

special, what was before general; to limit the number, and, as it were, to put a badge upon the places against which maritime quarantine can be declared, and hence to put a restriction upon the power of the Board.

"If the existence of disease, at some place, or in relation to some individual, was not a condition upon the Board's power to quarantine, it inevitably follows that the act contains something supremely important, not expressed in its title, namely, a power to quarantine against any place and exclude from the State any people whatsoever, totally irrespective of the existence of infectious or contagious disease, in relation to such person or place.

"We submit that the court will not adopt a course of reasoning which leads to this result.

"It must presume that the Legislature intended to obey Article 31 of the Constitution and to sanction no object in the act not expressed in the title. A *fortiori* will the court indulge the presumption when it finds that the title of the act declares the intention of conferring a limited and defined, as opposed to, a general power, as the Legslature was bound by the Constitutional mandate to do; that the measure of the power granted in relation to maritime quarantine is declared by the act to be fixed by existing laws in force, which laws are conceded by the contention of the defendants in this case to confer only a limited power, and plaintiff urges that if the statute of 1898 did authorize the State Board of Health to exclude from this State healthy persons coming from other States or from foreign countries, it was not a lawful exercise of the legislative power by the State of Louisiana.

"That the statute, on its face, and as applied, is void for the reason that it is in violation of Article 1, Section 8, of the Constitution of the United States, because it vests authority in the State Board of Health in its discretion to interfere with or prohibit foreign commerce; because it deprives the plaintiff of its liberty and property without due process of law and denies it the equal protection of the law in violation of Section One of the Fourteenth Article of Amendment of the Constitution of the United States.

"Because, it denies rights, privileges, and immunities, secured to subjects of the King of Italy, and to the citizens of the Republic of France by treaties between the United States and said countries, in that it vests the Board of Health with power to deny the right of free-

visitation and trade to Italian subjects and French citizens, as granted by said treaties.

"Because it is in conflict with the immigration laws of the United States, made in pursuance of the Constitution of the United States."

We would not render Act No. 192 of 1898, unconstitutional as violative of Article 31 of the Constitution of 1896, which declares that "every law enacted by the General Assembly shall embrace but one object, and that shall be expressed by its title," by holding that that act conferred authority upon the State Board of Health to prohibit the introduction into any infected portion of the State of persons acclimated, unacclimated, or said to be immune, coming on ship board from foreign countries and ports, whether infected or not, when in its judgment the introduction of such persons would add to or increase the prevalence of the disease.

Were we to hold that the act conferred such power, the granting of the power in the body of the act could be very legitimately referred to several different clauses of the title.

It would be very properly covered either by its declared object of "carrying into effect Article 296 of the Constitution of the State in relation to Boards of Health; providing for the establishment and organization of a State Board of Health, and of defining the power, duty and authority of said Board"; or its object "of protecting and preserving the public health," or "of authorizing the regulation of the isolation of infectious and contagious diseases."

We have ourselves recently held, in the case of Allopathic State Board of Medical Examiners vs. Fowler, 50th Ann., that it is a sufficient compliance with the constitutional requirements of the title if the title indicates the general purposes of the law without specifying in detail each particular provision of the law.

(See on this subject, 23rd Vol. Am. & Eng. Ency. of Law, page 229 et seq.; Cooley's Constitutional Limitations, page 173; State of Louisiana vs. Crowley, Nolan, Giles, and Bertin, 33rd Ann. 783; State vs. Dalon, 35th Ann. 1141; American Printing House vs. Dupuy, 37th Ann. 188.)

Appellants urge upon us that the General Assembly did not intend by and through Act No. 192 of 1898, to confer upon the State Board of Health the power which it exercised, of preventing them from landing the "Britannia" and its passengers, as stated in their petition, nor did it do so.

42

We do not think this proposition well founded; there is nothing in the terms of the statute which would justify us in giving to it the narrow construction for which plaintiffs contend.

The fact that the title contains a clause to authorize a "maritime and land quarantine against places infected with infectious and contagious diseases," is not inconsistent with, nor does it control or circumscribe the broad and general terms of other clauses.

Appellee properly claims that it in no wise affects the "power," "duty," and "authority," of the Board to prevent the spread of the disease when once introduced by quarantining against persons coming into an infected district.

The act, in its title, authorizes the State Board to regulate the isolation of cases of infectious and contagious diseases, leaving it to adopt the method to be pursued for bringing about this isolation.

In its body, it confers in very broad terms, a supervisory power over the care and control of infectious diseases within the State "in order to accomplish the subsidence and suppression thereof and to prevent the spread of the same."

That no doubt could exist as to the scope of the power, it conferred upon the Board "the right to regulate the terms and conditions on which intercourse with infected localities should be permitted," and in clear, unambiguous, language, authorized it, at its discretion, to prohibit the introduction into any infected portion of the State, of persons acclimated, unacclimated, or said to be immune, when, in its judgment, the introduction of such persons would add to or increase the prevalence of the disease.

The law does not limit the Board to prohibiting the introduction of persons from one portion of the State to another, and an infected portion of the State, but, evidently, looked as well to the prohibition of the introduction of persons from points outside of the State into any infected portion of the State. As the object in view would be "to accomplish the subsidence and suppression of the infectious and contagious diseases, and to prevent the spread of the same," it would be difficult to see why parties from outside of the State should be permitted to enter into infected places, while those from the different parishes should be prevented from holding intercourse with each other.

The object in view was to keep down as far as possible the number of persons to be brought within danger of contagion or infection, and

by means of this reduction to accomplish the subsidence and suppression of the disease and the spread of the same.

The particular places from which the parties, who were to be prohibited from entering the infected district, or disticts, came, could have no possible influence upon the attainment of the result sought to be attained.

It would make no possible difference whether this "added fuel," sought to be excluded, should come from Louisiana, New York, or Europe.

We see nothing in the particular place in the act in which this power is conferred, to cause us to suppose that the Legislature intended to place upon it the limitations which appellants contend for. They claim that the powers of the present Board were those of its predecessor, but this is obviously not the case.

The new Board was given, by the third section of the act, the powers of the old, but with such modifications as would be operated under the provisions of the Article of 1898.

It is very clear that the General Assembly intended to grant additional powers to the Board, and this very power was beyond question, one of them.

During the fall of 1897, and during the existence of an epidemic, a vessel arrived in the Mississippi river with immigrants aboard, under conditions similar to those under which the "Britannia" reached the same stream in 1898.

The excited public discussions at the time as to the right of the State Board, under the then existing law, to prevent the landing of the immigrants, and as to its duty in the premises, were so extended as to authorize us to take judicial notice of the fact, and, in our opinion, the clause in the present act, which covers that precise matter, was inserted therein for the express purpose of placing the particular question outside of the range of controversy.

For a number of years past immigrants have been coming into New Orleans in the autumn, from Italy.

There was a probability, when the General Assembly met, in 1898, that the epidemic of 1897 might be repeated, and a great probability that immigrants would seek to enter as they had done the year before, to the great danger, not only of the people of Louisiana, but of the immigrants themselves.

Independently of this, there was great danger to be apprehended

from the increasing intercourse between New Orleans and the West India Islands, in consequence of a war with Spain.

It was to ward off these dangers that this particular provision was inserted in the Act of 1898.

Appellants maintain that the act of the General Assembly is violative of the Constitution of the United States, and in contravention of its treaties with France and Italy, and its immigration laws.

We are not of that opinion.

It is the right and duty of the different States to protect and preserve the public health.

This right is not held by the States by permission of the Federal government, nor is its legitimate and proper exercise controlled by that government, simply by reason of the existence of a power in the latter, "to regulate commerce."

As a matter of course, State legislation which would cross the boundary line which separates the State's police power of protecting the public health, to really interfere with and invade the right and power of the general government to regulate commerce, would be set aside, but it is not every restriction upon commercial operations, remotely and incidentally brought about by the passage of State health laws, which can properly be designated as such interference or invasion.

*In re* Rahrer, 140th U. S. 554, the Supreme Court of the United States, speaking through Chief Justice Fuller, made use of the following language:

"The power of the State to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity, is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive.

"And this court has uniformly recognized State legislation, legitimately, for police purposes, as not in the sense of the Constitution infringing upon any right which has been confided expressly or by implication to the general government.

"The Fourteenth Amendment, in forbidding a State to make or to enforce any law abridging the privileges and immunities of citizens of the United States, or to deprive any person of life, liberty or property, without due process of law, or to deny to any person the equal protec-

tion of the laws, did not invest, nor attempt to invest, Congress with power to legislate upon subjects which are within the domain of State legislation.

"It is not to be doubted that the power to make ordinary regulations of police, remains with the individual States, and cannot be assumed by the National Government, and that, in this respect, it is not interfered with by the Fourteenth Amendment."

In Gibbons vs. Ogden, 9 Wheaton, page 203, Chief Justice Marshall, referring to State inspection laws, said, that "they were certainly recognized in the Constitution as being passed in the exercise of a power remaining with the States.

"That inspection laws might have a remote and considerable influence upon commerce could not be denied, but that a power to regulate commerce could not be admitted as the source from which the right to pass them was derived.

"That they formed a portion of that immense mass of legislation which embraces everything within the territory of a State, not surrendered to the General Government, all of which could be most advantageously exercised by the States themselves.

"That inspection laws, health laws of every description, as well as laws for regulating the internal commerce of a State and those which respect turnpike roads, ferries, etc., were component parts of this mass.

"That no direct general power over those objects was granted to Congress, and consequently, they remained subject to State legislation."

The General Assembly of this State, in enacting Act No. 192 of 1898, was not acting or claiming to act under "a power to regulate commerce," as the source from which it derived the right to pass the act.

Its source was the police power of the State, exercised for the protection and preservation of the public health.

No one who reads the act, or who knows and appreciates the circumstances under which it was enacted, can for a moment doubt the perfect sincerity of the General Assembly in dealing with this matter.

It was futile to say that there was any other purpose in view than that which appears on the face of the act.

There could exist no other possible motive than that announced.

None other can be plausibly suggested.

We not only think the Legislature acted in absolute good faith, and under no disguisement, but are of the opinion that the legislation was timely and judicious, well calculated to assist "in accomplishing the subsidence and suppression of infectious and contagious diseases and preventing the spreading of the same," and we are further of the opinion, that the action of the State Board was legally taken, under the provisions of the act, and not arbitrary and unjustifiable, as claimed.

The conclusions we have reached as to the provisions of Act No. 192 not being unconstitutional as infringing upon the right and power of Congress to regulate commerce, carries with it as a result, the holding by this court that the act was not in contravention of the treaties of the United States with France or Italy, or of the immigration laws of the general government, or of any rights secured by the Fourteenth Amendment of the Constitution of the United States.

The treaties and laws of the United States must be held to have been passed with reference to and subsidiary to the rightful exercise of the police power by the different States, in aid of the protection and preservation of the public health within their respective borders.

We scarcely think it could be pretended that an act of the General Assembly of Louisiana, under the provisions of which a ship load of citizens of the State of New York could be legally prevented from being landed in the city of New Orleans, during an epidemic, could, by reason of a treaty, be held as against foreigners coming to our shores, to be inoperative, null and void.

They could have no broader rights than our own citizens, in this matter, and should be subjected to the same restrictions and inconveniences which they are, when these are demanded at their hands for the preservation and protection of the public health.

The claim of the plaintiffs that they have been deprived in the premises of their liberty and property, without due process of law, is utterly untenable.

They have not been deprived of liberty nor of property, but simply prevented from doing an act which if permitted to be done, would not only be to the great injury and damage of the people of Louisiana, but in all likelihood, to the great damage and injury of the passengers upon their ship.

We do not see "what process of law," beyond that taken, could have been taken by the health authorities.

It is very unfortunate that plaintiffs' ship and her passengers should have been detained as they were, but if loss has been suffered it is *damnum absque injuria.*

The defendant Board is not an ordinary corporation; it is a "body politic," with corporate powers, with the right to sue and be sued.

It is a governmental public agency, representing the State in respect to the matters with which it stands entrusted.

Were this court to find plaintiffs entitled to a judgment, it would not be an ordinary judgment, susceptible of execution by *fi. fa.*

The judgment would be, substantially, one against the State; and of the character of those referred to in Article 192 of the present Constitution.

Plaintiffs charge that the resolution adopted by the Board of Health, though general in terms, was in reality directed specially against them.

The arrival of plaintiffs' ship under the circumstances then existing, may have given rise to the resolution as evidencing a necessity for action under the power conferred on the Board by the Act of 1898, but the fact that it was the first ship to which the resolution was made to apply, would not justify the charge that it was specially aimed in an offensive sense, at the plaintiffs.

The resolution is general, and there is no reason to suppose that it would not have been executed against any other ship or ships which might fall under its terms.

Be that as it may, if the Board had the legal power and right to act as it did, the motive with which it may have been done is not a matter for our consideration.

Our conclusions absolve, necessarily, the members of the Board from legal liability for their course.

For the reasons assigned, it is ordered and decreed that the judgment appealed from be and the same is hereby affirmed.