[No. 41516.    En Banc.    August 26, 1971.]

CHIA CHU GEORGE HSIEH *et al., Appellants,* v. CIVIL SERVICE
COMMISSION OF THE CITY OF SEATTLE *et al.; Respondents.*

*Schweppe, Doolittle, Krug & Tausend* and *Peter E. Paget,*
for appellants.

*A. L. Newbould, John P. Harris,* and *James M. Taylor,*
for respondents.

NEILL, J.—The sole issue raised by this appeal is the validity of the provision in the Seattle City Charter and civil service rules which limits eligibility for the city's civil service examination to United States citizens. We hold that such provision as applied to these plaintiffs constitutes an invalid interference with laws of the United States in a field of federal supremacy.

Plaintiffs appeal from a judgment of dismissal of their declaratory judgment action. The action seeks a decree (1) permitting plaintiffs to take civil service examinations and (2) enjoining Seattle city officials from discharging plaintiffs from their current employment, other than as provided for termination of employment of persons within the city's civil service system.

Article 16, § 6 of the Seattle City Charter provides in part:

All applicants for offices or places in the classified civil service shall be subject to examination, which shall be public, competitive and open to all citizens of the United States with specified limitations as to residence, age, health, habits and moral character . . .

Civil service rule 4.01, adopted pursuant to charter authority, provides that in order to qualify for examination the applicant must be a citizen of the United States. Rule 7.07 allows provisional employment of noncivil service persons when there is no suitable eligible register of regular civil service personnel available. Such provisional employment is restricted to 60-day, renewable periods, pending availability of an "adequate eligible register," and must cease within 21 days after notice that a regular civil service employee is available, unless an extension is granted by the secretary of the civil service department.

Plaintiffs are 18 residents and taxpayers of King County. Each is a "resident alien", having been granted permanent residency in the United States by the United States Department of Justice. During oral argument we were advised that each of the plaintiffs had filed his declaration of intent to become a United States citizen pursuant to federal nat-

uralization law. All are competent engineers who have been employed by the city of Seattle under "provisional" appointments for lengths of time ranging from about 1 year to more than 3 years. Being "provisional" employees, plaintiffs are subject to termination for no other cause than the certified availability of an eligible "regular" employee for his position.

The city recruited plaintiffs during a period of critical shortage of engineers in the Puget Sound area. Recruiting advertisements were broadly published in the city's search for trained engineers. Plaintiffs moved to Seattle from other states (and in one instance from Canada) in response to this solicitation. They were not required to take civil service examinations at the time of their employment, but were employed as "provisional" employees under civil service rules.

In the fall of 1969, a register or list of persons eligible for permanent civil service employment in the positions held by plaintiffs was certified under the civil service rules. Faced with discharge under civil service rule 7.07, plaintiffs applied to take the examination for admission to the classified service. Each application was rejected, solely on the basis that the applicant was not a citizen of the United States. There is no issue as to the competency, character or work performance of any plaintiff.

Plaintiffs asserted to the trial court and here contend that the citizenship requirement of the city charter and the civil service rules is invalid on any one of five grounds: (1) conflict with the federal scheme under the Immigration and Naturalization Act of 1952, as amended (8 U.S.C. § 1101, et seq.); (2) conflict with the Washington Anti-discrimination Law (RCW 49.60); (3) conflict with the Civil Rights Act of 1870 (42 U.S.C.A. § 1981); (4) violation of the Due Process Clause (U.S. Const. amend. 14); (5) violation of the Washington and federal equal protection clauses (Const. art. 1, § 12; U.S. Const. amend. 14).

The protections of the Fourteenth Amendment apply to aliens as well as citizens. *Truax v. Raich*, 239 U.S.

33, 60 L. Ed. 131, 36 S. Ct. 7 (1915). Further, enactments of municipal corporations constitute "state action" within the Fourteenth Amendment. *Avery v. Midland County,* 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114 (1968). The meaning of these constitutional provisions in the context of aliens' rights has been succinctly stated by Justice Murphy in his concurring opinion in *Bridges v. Wixon,* 326 U.S. 135, 161, 89 L. Ed. 2103, 65 S. Ct. 1443 (1945):

> Since an alien obviously brings with him no constitutional rights, Congress may exclude him in the first instance for whatever reason it sees fit. *Turner v. Williams,* 194 U. S. 279. The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.

We find it unnecessary to deal with each of plaintiffs' contentions as we are of the opinion that the federal supremacy in the field of immigration as exercised by Congress precludes the city from establishing citizenship as a condition to eligibility for civil service examination for general public employment in occupations which have been designated as needed by the Secretary of Labor.[1]

The memorandum opinion of the trial judge makes clear that he felt compelled to his decision by language in our prior cases that "the state and the various municipalities within it have the right to say that public work shall be done in any manner, at any price, and upon any terms

---

[1] As to the constitutional consideration, *see Constitutionality of Restrictions on Alien's Right to Work,* 57 Col. L. Rev. 1012 (1957); *The Alien's Right to Work,* 49 Col. L. Rev. 257 (1949); *National Power to Control State Discrimination Against Foreign Goods and Persons: A Study in Federalism,* 12 Stan. L. Rev. 355 (1960).

which they see fit to lay down." *Jahn v. Seattle,* 120 Wash. 403, 406, 207 P. 667 (1922). *Cornelius v. Seattle,* 123 Wash. 550, 213 P. 17 (1923). The trial judge apparently felt precluded from the more modern and hospitable approach suggested in *Purdy & Fitzpatrick v. State,* 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77 (1969), because, as stated in his memorandum opinion, "Unfortunately, the *Purdy* case is not the law of the State of Washington nor of the United States, even assuming its applicability to the facts of this case."

We do not read *Jahn* and *Cornelius* as establishing a rule of absolute discretion in state or local governments as to who will be allowed employment relating to public works. *Jahn* was a departmental decision in which we upheld a municipality's power to require that private contractors on public works projects pay their employees at a rate no less than that paid by the municipality for work of like character. In the context of that issue, we said:

> Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern."

> In other words, the state and the various municipalities within it have the right to say that public work shall be done in any manner, at any price, and upon any terms which they see fit to lay down. It is in the power of the state and of its subsidiary municipalities to say that public work shall not be done, or that it may be done, and in the latter case it can prescribe the terms and conditions upon which it will allow it to be proceeded with.

*Jahn v. Seattle,* 120 Wash. 403, 406, 207 P. 667 (1922). We there also took note of then extant United States Supreme Court cases upholding provisions regarding nonemployment of aliens on public work. *Heim v. McCall,* 239 U.S. 175, 60 L. Ed. 206, 36 S. Ct. 78, Ann. Cas. 1917B 287 (1915); *Crane v. People of New York,* 239 U.S. 195, 60 L. Ed. 218, 36 S. Ct. 85 (1915). However, *see Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971), wherein, in referring to *Heim* and *Crane,* the Supreme Court stated: "But this Court now has rejected the concept that constitu-

tional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' " It should be clear from a complete reading of the *Jahn* opinion that our language had reference to situations where the subject matter suggests only those considerations of local public policy with which courts have no concern. The result and reasoning of the *Jahn* case were not directed to such other considerations as preemption by or conflict with superior law.

*Cornelius v. Seattle,* 123 Wash. 550, 213 P. 17 (1923), also a departmental decision, involved a city ordinance limiting the collection of swill from public eating places to responsible citizens of the United States. Unfortunately, in the course of that decision, we made the overbroad statement that *Jahn* "held" that a city may limit public employment to United States citizens. There, we stated at page 557:

> It may be admitted without cavil . . . that the fourteenth amendment applies equally to aliens as to citizens. *Yick Wo v. Hopkins,* 118 U. S. 356; *Wong Wing v. United States,* 163 U. S. 228; *United States v. Wong Kim Ark,* 169 U. S. 649; *Truax v. Raich,* 239 U. S. 33.

We then concluded that the ordinance did not violate the equal protection clause of the Fourteenth Amendment. But to say that a city may limit public employment to United States citizens in some instances is not to say that such limitations are valid in *all* instances. Whatever the continuing validity of this conclusion, the present point is that *Cornelius,* even with its broad reading of *Jahn,* does not stand for the proposition that state or local governments are completely free to discriminate against aliens in public employment. *Cornelius* does not preclude courts from assessing such discrimination in the light of superior statutory law.

Thus, as we understand those cases, neither *Jahn* nor *Cornelius* grants an unrestricted license to discriminate against aliens in public employment.[2] In neither case was

---

[2]That which may already be obvious should be emphasized. In this case we are concerned with discriminatory limitations in general public

there any asserted inconsistency with superior legislation. Moreover, the generations intervening since those cases have seen significant developments: first, with regard to application of the equal protection clause of the Fourteenth Amendment and, second, in the area of federal immigration and naturalization law.

█ Developments in constitutional equal protection indicate that discrimination in public employment on the basis of alienage invokes strict judicial scrutiny. We have already noted that the guarantees of the equal protection clause extend to aliens. Over the decades since *Jahn* and *Cornelius, supra,* were decided, this concept has been expanded and clarified through application by our nation's highest court. For one thing, it has become clear that states may not, without violating the equal protection clause, construct arbitrary classifications regarding qualifications for public employment. *Wieman v. Updegraff,* 344 U.S. 183, 97 L. Ed. 216, 73 S. Ct. 215 (1952); *Whitner v. Davis,* 410 F.2d 24 (9th Cir. 1969). Discriminatory classifications must be justified as reasonably related to, and a necessary means of accomplishing, the purposes of a law which promotes a compelling, legitimate state interest. *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969); *McLaughlin v. Florida,* 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964); *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948). *See, generally, Developments in the Law—Equal Protection,* 82 Harv. L. Rev. 1065 (1969).

Our purpose in tracing these developments is not to discuss constitutional arguments as they might pertain to this case. We do not reach the constitutional issues raised by plaintiffs. Rather, our purpose is to note the expanding

employment as distinguished from employment which arises to the status of public office or position, a distinction which has long been recognized. *E.g., Oceanographic Comm'n v. O'Brien,* 74 Wn.2d 904, 447 P.2d 707 (1968); *State ex rel. McIntosh v. Hutchinson,* 187 Wash. 61, 59 P.2d 1117, 105 A.L.R. 1234 (1936); *State ex rel. Allen v. Spokane,* 150 Wash. 542, 273 P. 748, 277 P. 999 (1929); *Nelson v. Troy,* 11 Wash. 435, 39 P. 974 (1895). With that latter area we are not presently concerned.

536

application of equal protection principles to governmental actions. These developments serve to underscore two threshold points. First, discrimination solely on the basis of alienage, a process inconsistent with the principles of a free and open society, is also highly suspect under the specific constitutional precepts of the Fourteenth Amendment. Second, any such discrimination invokes strict standards of judicial review. To these we add the earlier observation that our case precedent does not foreclose a review of local provisions which discriminate as to public employment on the basis of alienage.

With the foregoing as background, we turn to the argument that these Seattle citizenship restrictions are an invalid interference with the authority of the federal government to control immigration. At the outset we reiterate the fact that we are dealing with a case involving qualifications for general employment. Conversely, this is not a case involving preferences in public employment or qualifications for public office, law enforcement, or policy making positions.

It is a matter of long established federal law that Congress has the exclusive power to regulate immigration and naturalization. U.S. Const. art. 1, § 8, clause 4; *Hines v. Davidowitz,* 312 U.S. 52, 85 L. Ed. 581, 61 S. Ct. 399 (1941); *Fong Yue Ting v. United States,* 149 U.S. 698, 37 L. Ed. 905, 13 S. Ct. 1016 (1893); *accord: Purdy & Fitzpatrick v. State,* 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77 (1969). State (and local) laws cannot substantially encroach upon this power. *Truax v. Raich,* 239 U.S. 33, 60 L. Ed. 131, 36 S. Ct. 7 (1915). Nor may state or local laws stand if they impede, burden or obstruct the full execution of a comprehensive congressional scheme regulating a particular aspect of immigration. U.S. Const. art. 6, clause 2; *Nash v. Florida Indus. Comm'n,* 389 U.S. 235, 240, 19 L. Ed. 2d 438, 88 S. Ct. 362 (1967); *Hines v. Davidowitz, supra.*

For our purposes, the relevant congressional scheme derives from the Immigration and Nationality Act of 1952, as amended (8 U.S.C. § 1101, *et seq.*). The import of this legis-

lation is well summarized in *Purdy & Fitzpatrick v. State, supra,* at page 82:

> The Immigration and Nationality Act of 1952, as amended (8 U.S.C. § 1101 et seq.) provides that all immigrants, excepting immediate relatives of United States citizens or of lawfully admitted resident aliens, who seek to enter the United States for the purpose of performing skilled or unskilled labor *shall be excluded* unless the Secretary of Labor certifies that "(A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of the application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed." (8 U.S.C. § 1182(a) (14).) Although the Secretary may pass upon applications for certification upon an individual basis, more often certification depends upon preexisting determinations that certain occupations are experiencing labor shortages within the United States. From time to time, the Secretary publishes schedules of such occupations in the Federal Register.
>
> . . .
>
> In light of the comprehensive federal scheme for dealing with the admission of aliens who seek to enter the American labor market, any state [or local] legislation affecting this same subject matter runs a high risk of conflict with the supreme law.

(Footnote omitted.)

It is of more than passing interest that the California court used, as an example of clear conflict, a case where a state statute precluded architects and civil engineers (certified as needed by the Secretary of Labor) from employment on public works. In *Purdy,* the court was not faced with an actual conflict between state exclusionary law and federal regulation in this field. The court there struck down a California law proscribing employment of aliens on public works, because "[T]he opportunity for potential conflict is too great to permit the operation of the state law." The facts now before us are more direct. Plaintiffs are civil

engineers. As such, they have been specifically designated by the Secretary of Labor as persons possessing needed skills. 29 CFR § 60.6, schedule A (1969, 1970).

Clearly, the federal scheme for immigration is intended to and does regulate alien employment to some extent. The schedule promulgated by the Secretary of Labor defines those aliens whose immigration to this country is desirable because they possess needed skills. This determination is not made in ignorance of local conditions; rather, in certifying the schedule, the secretary must consider the labor conditions in "the place to which the alien is destined." 8 U.S.C. § 1182(a)(14). Whatever the wisdom of this part of the comprehensive federal scheme, the inescapable fact is that the determination is preempted by federal law and placed in the hands of the Secretary of Labor. We see no basis in the present facts for a suggestion that the secretary has exceeded proper limits in designating civil engineers within his schedule, and the city of Seattle makes no such suggestion. To the extent that Seattle's local provisions discriminating against these aliens have the effect of deterring the execution of the federal law, those provisions intrude upon federal prerogatives and cannot stand.

It is asserted by the city that the instant facts are distinguishable from those in the *Purdy* case because (1) *Purdy* involved "ordinary" occupations, whereas this case involves engineers and, (2) *Purdy* involved a statute which proscribed all employment of aliens on public works, whereas the provisions here do not prevent employment but only the job-security (tenure) of civil service for aliens.

As to the first asserted distinction, we find nothing which militates in favor of these discriminatory provisions. To the contrary, the occupations of plaintiffs are within the schedule certified by the Secretary of Labor, while the occupations involved in *Purdy* were not so certified. From the standpoint of federal preemption, this difference favors plaintiffs rather than the city.

The second suggested distinction is premised on the fact that this citizenship restriction does not prevent em-

ployment of aliens, but only bars the tenure that would otherwise be available to them within the civil service. Implicit in this suggestion is the idea that while substantial denial of public employment would be an invalid intrusion on congressional authority,[3] denial of job-security would not. We find this suggestion unrealistic. The provisional employment available to plaintiffs under the city's civil service rules is uncertain at best, subject to termination at any time without cause and within 21 days of notice that there is an eligible candidate for the position. The result, though more indirect, is a very real interference with the opportunities of federally certified aliens to earn a living as public employees in the Seattle area. From the standpoint of encroachment upon the comprehensive federal scheme, this is a distinction without a difference.

State and local governments can "neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948). If labor conditions within the area render the federal scheme unwise as applied, then the appropriate remedy is with the federal officials concerned. We note, as did the California court in *Purdy & Fitzpatrick v. State,* 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77, 85 (1969), that Seattle "does not remain, therefore, without power to act, but merely without power to act with final authority upon a matter for which Congress has determined that one na-

---

[3]*See Truax v. Raich,* 239 U.S. 33, 42, 60 L. Ed. 131, 36 S. Ct. 7 (1915):

The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality.

tional policy administered by the federal government should prevail."

Accordingly, we conclude that the citizenship restrictions of Seattle City Charter, art. 16, § 6, and of Civil Service Code 4.01 b(1), as applied in areas of general public employment, are invalid obstructions to the execution of the comprehensive federal scheme for immigration and naturalization. Our conclusion finds added support in the rationale of the recent pronouncement of the United States Supreme Court in *Graham v. Richardson, supra.* Plaintiffs are entitled to take the civil service examination.

Plaintiffs urge that upon taking the civil service examination, and assuming their success thereon, they should be afforded civil service status nunc pro tunc to the dates of their respective initial employment. But, beyond the controverted assertion that the city "waived" the examination when hiring plaintiffs, there is no affirmative evidence on which to base a claim to such early status. The trial court found that plaintiffs were hired as provisional employees. We see nothing in the civil service rules which makes provisional hiring, for which examination is not required, ipso facto a waiver of examination to attain civil service status. Plaintiffs could have made application at any time and we see no injustice, absent countervailing evidence, in limiting plaintiffs' potential retroactive status to such time as each would have been entitled had he taken and passed the first examination following his application. The trial court did not reach this issue and the record is inadequate for a determination by us.

Reversed and remanded.

HAMILTON, C.J., FINLEY, ROSELLINI, and STAFFORD, JJ., concur.

HALE, J. (dissenting)—According to the Seattle charter, professional engineers in the permanent civil service must be citizens of the United States. This court, however, acting partly upon what it perceives to be a superior federal policy, not only voids this citizenship provision of the Seattle

City Charter governing the city's classified civil service but declares it unconstitutional as well. If the asserted federal policy should change or in fact does not exist, the charter provision will thus remain void.

Being unable to find any signs of such a federal policy—other than the court's assertion that it is there—I doubt its existence; but should it be located, I doubt even more that it would prove superior. Assuming, arguendo, such a policy, wherein can it be held to control purely local policy over purely local affairs? Congress has plenary powers over the entry, stay, exclusion, naturalization and expulsion of aliens (*Henderson v. Mayor of New York*, 92 U.S. 259, 23 L. Ed. 543 (1875)), but these powers do not in any way purport to control, override or impinge upon local laws establishing and governing a municipal civil service system. The one power has little or nothing to do with the other. It should not be overlooked that certain basic tenets of self-government inhere in both constitutions, which effectively preclude the emergence of the very kind of federal policy asserted by the court here, *i.e.*, that a city or state, contrary to its organic laws be compelled to employ resident aliens. If there is not and cannot in law be a federal policy supreme and overriding in the premises, it follows that the Seattle charter, when fairly applied and reasonably administered, does not violate either the due process clause or the equal protection clause of the constitutions.

The issue, then, is whether the City of Seattle acts within its legislative and constitutional powers in requiring that professional engineers, permanently employed and paid by the city, must be citizens of the United States. Any federal policy purporting to abrogate these powers must rest on constitutional authority or else be held incompatible with the structure of self-government as set up by the constitutions. A city is not only a body corporate, but a body politic as well. It is a basic unit of self-government designed to carry out and exercise the delegated powers of state sovereignty reserved to the states by the constitution. A city is a completely public body; it owns or uses no property, carries

on no activity, except in trust for the people—primarily for those within its corporate limits and secondarily for the public at large. Since it is not only a body corporate but a body politic as well, a city is totally a public entity. Everything a city does is a public act done for the public good. Being a body politic, a city or a state may, in the public interest, legislate and regulate as to matters and things affecting the public welfare, that is those things affecting the public safety, peace, health, morals and welfare. If a city may legislate to create a civil service, it follows that it may impose standards, qualifications and classifications for those whom it will employ in that service and if these are reasonable and fairly applied the city acts within its powers in prescribing them. Fixing American citizenship as a condition for professional employment in the civil service, when applied equally to all aliens, therefore, is no more than the lawful exercise of local powers of government over local functions. It is a legislative policy adopted by the City of Seattle as a minimal standard deemed by the people of Seattle as a condition essential to accomplishing the city's mission in government. The court, in my opinion, should respect this citizenship provision as a legitimate exercise of the people's legislative powers on an exclusively local matter in an exclusively legislative sphere. The court should not set a judicial policy above a legislative policy.

To require American citizenship as a condition for appointment to the classified civil service seems to me to be neither unfair nor oppressive nor unreasonable. There is nothing about it to indicate that the people of Seattle were animated with a spirit of oppression or purpose of discrimination against resident aliens in putting such a provision in their charter. They did no more than adopt what has become a standard requirement in most areas of government throughout this country—a standard implicitly recognizing that nearly all eligible resident aliens who have declared it their purpose to become citizens of the United States will in the due course of time become naturalized; that where there is a will there is a lawful way. The charter provision

voided by the court expects no more of resident aliens than that they comply with the immigration and naturalization laws, allow the minimal time to elapse, abide by the law of the land, and take the oath of allegiance and renunciation without mental reservation. A court is without jurisdiction even to enter a decree of naturalization and confer citizenship upon a petitioning alien until the petitioner has lived in this country for the prescribed interval and, in open court, sworn to support and defend the constitution and laws of the United States against all enemies, foreign and domestic, renounced all allegiance and fidelity to his native land or province, and promised to bear arms or otherwise defend this country. Aliens and Nationality, 8 U.S.C. § 1447 (1970). He also must renounce in open court any title or order of nobility either hereditary or bestowed and all of the political powers that go with it. If these are the minimal requirements of naturalization, there is nothing extraordinary or oppressive about including them in the civil service standards.

Requiring that naturalization be completed, in my judgment, is a good rule; it elevates citizenship without disparaging alienage; it does not in any way repudiate the recognition of what the immigrant and his posterity have done for this country, nor does it disparage their status as resident aliens. Where this nation has contributed greatly to the welfare of the immigrant and his family, the immigrant and his family have made reciprocal contribution to the welfare of the nation. Our national progress and development, the preservation and extension of our constitution, the expansion of our ideas of personal freedom and the vigorous perpetuation of democratic ideals—everything we have been and hope to be as a nation—rests in substantial degree upon the devotion, talents and skills and unstinting industry of the millions who came here from foreign shores to adopt this country as their own. Fighting its wars, working the mines and mills, farms and factories, building its railways and ships and structures and loading and hauling its goods and products alongside those who were born here

represent only a part of their contribution. The monumental services rendered by immigrants in other spheres, too, are immeasurable—in the arts, sciences, professions, as well as in the law itself. That an alien must be a citizen before receiving permanent work with the city does not disavow the alien's services to his adopted country in peace and war, good times and bad; it merely sets up another goal readily within his reach.

Thus, I see nothing unreasonable, oppressive, or invidiously discriminatory in requiring that the petitioners here complete their probationary sojourn, take the oath of allegiance and renunciation without mental reservation and make a binding promise to uphold the constitution and laws of the United States, and promise to protect and defend this country even in such extreme contingencies as armed conflict with their native land, before they join Seattle's civil service as professional engineers.

The function of a professional engineer on the city's payroll is on its face an activity identified with the public interest and one affecting the public welfare and safety. If the federal government entertains any policy concerning such activity or employment, it has kept that policy a secret. And whatever federal policy may exist toward employment of aliens, it is quite unlikely to encompass the idea that their entry and presence make them eligible before naturalization for permanent classified professional civil service of either cities or counties or the several states or of the United States. The federal government in all of its legislation appears to place no lower value upon citizenship than do the states and cities.

Such signs of a federal policy affecting the Seattle civil service as do exist point, moreover, to a policy 180 degrees opposite to the one postulated by this court. Before an immigrant is permitted entry, he is subject under federal law to a complex, restrictive and highly selective quota system. Aliens and Nationality, 8 U.S.C. §§ 1101, 1153 (1970). His admission is based on priorities and preferences. Aliens and Nationality, 8 U.S.C. §§ 1151-54 (1970).

He must, after entry, complete a minimum term of residence before he becomes eligible for naturalization. By statute, federal immigration policy is narrow, restrictive and selective. There are many factors which affect the mandatory preconditions. For example, if an alien is married to a citizen, his period of required residence is reduced from 5 to 3 years. Aliens and Nationality, 8 U.S.C. § 1430 (1970). Thus, for decades, Congress has, contrary to the policy asserted by this court, ordained a highly selective and limited quota scheme for immigration and naturalization—a policy designed to curtail immigration and prevent, too, the entry and naturalization of criminals (Aliens and Nationality, 8 U.S.C. § 1182(a) (1970)), indigents, unskilled, unhealthy, mentally unbalanced, subversive or dangerous aliens. From time to time, the policy is changed and adjusted to accommodate to economic and social conditions in this country with a constant eye to the rate of unemployment here. Federal policy is thus express and explicit, set forth with great particularity by law. I would take these statutes as a declaration of policy in preference to the nebulous ideas asserted by this court on the subject. Thus, the immigration and naturalization statutes are not only selective as to quality but protective of our economy and institutions as well, and Seattle's charter would seem to be more compatible with the policy expressly delineated in federal statutes than in the policy found by this court.

Nothing about the immigration and naturalization statutes conveys the idea that Congress intended that aliens admitted for ultimate naturalization be eligible for employment in the public service before they attain citizenship. They do not invite a reciprocal arrangement either. Just as federal policy does not intrude upon Seattle's civil service laws, neither do Seattle's charter provisions intrude upon nor presume to override entry quotas, the conditions of entry, the duration of the alien's stay here, the grounds for exclusion or expulsion. The charter is and remains a local law limited precisely to local affairs.

In summary as to a purported federal policy, the statutes

prescribing the quotas, conditions and qualifications for the exclusion, entry, naturalization and expulsion of aliens (Aliens and Nationality, 8 U.S.C. § 1101 (1970)), relate in no discernible way to the minimum standards of employment for professional engineers in the City of Seattle's classified civil service. Congress has passed no law contemplating or presuming to require that the permanent civil service, either federal or state or municipal, be open to resident aliens. Neither provisions of the constitutions nor acts of Congress require or even intimate that the states and their subdivisions surrender their civil service standards and furnish employment in the civil service to whomever the immigration and naturalization service might choose to allow to enter and reside in this country. The policy upon which the court seems to rest its opinion, I think, does not exist; and if it did exist, it could not be said to override or control local laws governing local civil service.

Nor are we faced here with the more complex question of a resident alien's treaty rights, for no treaty provisions between the United States and the Republic of China—or with any other nation, for that matter—germane to this issue have been brought to our attention, and presumably no treaty exists contemplating the remedy petitioners seek here.

While the charter does effectuate a basic right of self-government, it does not presume to interfere with Congress' plenary powers over immigration and naturalization nor to repudiate the idea that a resident alien cannot be denied the ordinary means of earning a livelihood by state law. It simply exercises a basic tenet of constitutional doctrine that the state and its subdivisions may make reasonable classifications in protecting or advancing legitimate state and municipal interests. So long as a regulation applies equally to all within the classification and is fairly administered, it cannot be held unreasonable or discriminatory.

Congress is without power to control the exercise of police powers by the states in legislating generally with re-

spect to resident aliens. *Keller v. United States,* 213 U.S. 138, 53 L. Ed. 737, 29 S. Ct. 470 (1909). Thus, had it presumed to legislate upon the subject of Seattle's civil service, its statutes would have no more overriding effect on the Seattle civil service laws than had Congress presumed to override Seattle's traffic code. Accordingly, in fixing United States citizenship as one of the minimal requirements for professional engineers in the civil service, the Seattle City Charter cannot be said to qualify, alter or affect the operation or application of any immigration and naturalization laws, nor the admission, exclusion, expulsion of aliens, nor contravene any federal policy, real or imagined. As a purely local policy, the city charter is neither inferior nor subordinate to any federal policy affecting the identical subject or material.

There is no magic either in the petitioners' status of being now admitted for permanent residence as mentioned by the court. Lawful admission for permanent residence is but one of the conditions an alien must meet before seeking citizenship; he cannot even initiate proceedings for naturalization unless he has been admitted to this country as, or later becomes, a permanent resident and declares under oath his intention of filing a petition for naturalization. Aliens and Nationality, 8 U.S.C. § 1445 (f) (1970). The status of admission for permanent residence imposes no obligation to pursue the next step or steps toward citizenship. An alien's declaration of intention is merely preliminary to and far removed from achieving citizenship for the statute specifies:

> nor shall such declaration be regarded as evidence of such alien's lawful admission for permanent residence in any proceeding, action, or matter arising under this chapter or any other act.

Aliens and Nationality, 8 U.S.C. § 1445 (f) (1970). Prevailing concepts of international law recognize the existence of significant differences between citizenship and alienage. However loyal an alien's intentions to this country may be, he is subject to the foreign power which has calls upon his

allegiance. Our government, by international law, respects these calls and must accord him whatever benefits the alien may derive from them. *Harisiades v. Shaughnessy*, 342 U.S. 580, 96 L. Ed. 586, 72 S. Ct. 512 (1952). Under federal statute, plaintiffs retain the detriments as well as the advantages afforded them by their native country until by oath of renunciation and allegiance they have severed their political ties and made this country their own. Permanent residence thus gives the alien no special standing not specifically granted by statute and is simply a precondition generally for eventual naturalization.

This court ought not interfere with federal immigration and naturalization policy. Where yesterday agencies of the federal government might have hoped that all aliens be admitted to employment on precise and equal terms with citizens, today they may well take an opposite view and be actively engaged in reserving governmental employment for citizens only depending upon economic conditions here and abroad and our current relationships with foreign countries. The court's decision in this case can have far-reaching and unexpected consequences in innumerable instances. American citizenship has been fixed by law as a standard in hundreds of instances for callings, professions and businesses so identified with or affecting the public interest as to be subject to regulation by the state under the police power. The court, holding in effect that the requirement of citizenship here is void, now places these standards in jeopardy.

Washington statutes requiring United States citizenship cover a wide range of activity, circumstances and conditions. Thus, a court commissioner must be both an elector and a citizen of the United States (RCW 2.24.010); attorneys and counselors at law are required by statute to be United States citizens (RCW 2.48.190), and must, by similar statute, take an oath that they are citizens. RCW 2.48.210. The judicial council is under a duty to consider suggestions from "judges, public officers, members of the bar, and *citizens*" concerning "remedies for faults in the

administration of justice." (Italics mine.) RCW 2.52.050. Nor can anyone serve as a justice of the peace who is not a citizen of the United States (RCW 3.04.040); or serve process issued by a justice of the peace (RCW 12.04.050); or sit on a justice court jury (RCW 12.12.050); or act as a municipal judge. RCW 3.50.040. Garnishment process cannot be served by aliens, but must be done either by the sheriff or a citizen of the state of Washington over the age of 21 years. RCW 7.33.130. Apparently to prevent a rash of lawsuits and the abuse of judicial process, the power to maintain suits to enjoin certain nuisances is limited to the prosecuting attorney and *citizens* of the county where the nuisance exists. RCW 7.48.060, .070. Special juries to try eminent domain cases must be drawn from citizens of the county. RCW 8.04.080-.100.

Membership in the State Aeronautics Commission is restricted to citizens of the state (RCW 14.04.030); and so is membership on the Apple Advertising Commission (RCW 15.24.020); and the same applies to a commission established to carry on fruit tree research (RCW 15.26.050); and to the Washington State Fruit Commission (RCW 15.28.030); and to the Washington State Dairy Products Commission (RCW 15.44.030); and the Washington State Wheat Commission. RCW 15.63.040. Members of commodity boards must be citizens of this state (RCW 15.65.230), and the same applies to commodity commissions (RCW 15.66.110), and local agricultural committees (RCW 15.68.130), as well as the beef commission. RCW 16.67.040. To vote for the office of director of a weed control district, the elector must take an oath that he is a "citizen of the United States." RCW 17.04.070; RCW 17.06.050.

Members of the State Board of Accountancy must be citizens of the United States. RCW 18.04.030, .040, .050. Temporary permits to practice accounting may be revoked or canceled if the licensee fails to become a citizen within 6 years of the issuance of his temporary license. RCW 18.04.300. As to practicing as an architect, the statute requires citizenship or intended citizenship. RCW 18.08.140.

The same applies to beauty culture. RCW 18.18.050. But chiropractors, however, must become citizens before they are licensed. RCW 18.25.015. One may not engage in the business of debt adjusting unless he is a citizen of the United States. RCW 18.28.060. And the profession of dental hygienist is likewise restricted to citizens. RCW 18.29.020. Dentists must be citizens or "have first papers for naturalization" (RCW 18.32.100), and the license will not be subsequently renewed until the applicant has attained full citizenship. RCW 18.32.160. Members of the State Board of Registration for Professional Engineer and Land Surveyor must be citizens. RCW 18.43.030.

Optometrists (RCW 18.53.060) and pharmacists (RCW 18.64.080) cannot be licensed to practice or serve on the state board (RCW 18.54.030; RCW 18.64.001) unless they are citizens. Doctors serving on the Board of Medical Examiners are required to be United States citizens (RCW 18.71.015); and the members of the Board of Registered Professional Nurses must be citizens. RCW 18.88.060. There are many other boards, professions and callings which by law require citizenship as a prerequisite.

Under the Washington Business Corporation Act (RCW Title 23A) and other statutes, one cannot serve as a receiver in a conservation or insolvency proceeding unless he is a citizen of the United States. RCW 23A.28.190; RCW 24.03.275; RCW 24.06.310. Nor can aliens teach in the public schools, except that temporary permits may be granted under certain circumstances to exchange teachers from foreign countries by the Superintendent of Public Instruction. RCW 28.67.020; RCW 28A.67.020. The Board of Regents of the University of Washington may exempt from payment of registration fees veterans *provided they were citizens* of the United States at the time of their enlistment and are citizens at time of registration. RCW 28.77.070. There are several statutes, too, prescribing United States citizenship as a requirement for membership on college boards and educational councils. RCW 28.85.050; RCW 28.89.040; RCW 28.89.060. United States citizenship is required for the five

or more persons who wish to incorporate a bank or trust company (RCW 30.08.010), or an industrial loan company (RCW 31.04.030), or the nine or more required to form a mutual savings bank (RCW 32.08.010), or the seven or more for a savings and loan association (RCW 33.08.020). City firemen must be citizens of the United States (RCW 41.08.070); as must members of the fire department civil service commissions (RCW 41.08.030); and so must police officers (RCW 41.12.070); and police civil service commissioners (RCW 41.12.030); and civil service sheriff's personnel (RCW 41.14.100), and chief and deputy mine inspectors for the state. RCW 43.22.160-.170. The youth corps of the state is composed of citizens of the United States (RCW 43.51.530); incorporators of domestic insurance companies must be citizens of the United States (RCW 48.06.200); and similarly, incorporators of fraternal insurance organizations. RCW 48.36.120.

No license to sell alcoholic beverages shall be granted to any noncitizen unless the privilege is granted by specific treaty. RCW 66.24.010. Aliens cannot serve on the State Horse Racing Commission. RCW 67.16.012. A resident alien farmer is not qualified to participate in flood control (RCW 86.09.364) or irrigation (RCW 87.03.045; RCW 87.60.150) district elections. No person may serve as a licensed ship's pilot within this state unless he is a citizen of the United States. RCW 88.16.090.

If, as it appears, these callings and professions are said to be affected with the public interest, the public interest even more directly and explicitly affected with the activity is that of public employment paid for entirely by public funds and dealing almost exclusively with publicly-owned property in serving the public.

Resident aliens, of course, have certain fundamental rights. They cannot under the Fourteenth Amendment constitutionally be deprived of life, liberty or property by the *states* without due process of law (*Terrace v. Thompson*, 263 U.S. 197, 68 L. Ed. 255, 44 S. Ct. 15 (1923)), nor under the Fifth Amendment by the United States. *Brownell v.*

*We Shung,* 352 U.S. 180, 1 L. Ed. 2d 225, 77 S. Ct. 252 (1956); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 97 L. Ed. 576, 73 S. Ct. 472 (1953). An alien in common with citizens cannot be held to answer for a federal crime except upon presentment or indictment of a grand jury (*Wong Wing v. United States,* 163 U.S. 228, 41 L. Ed. 140, 16 S. Ct. 977 (1896)), or be twice put in jeopardy for the same offense, or compelled in any criminal case to be a witness against himself. That is what the Fourteenth Amendment means when applied to an alien in saying that he is a person entitled to equal protection of the laws. *Wong Wing v. United States, supra; State v. Montgomery,* 94 Me. 192, 47 A. 165 (1900). An alien's property may not be taken for public use without just compensation (*Silesian-American Corp. v. Clark,* 332 U.S. 469, 92 L. Ed. 81, 68 S. Ct. 179 (1947)); and he is entitled to the constitutional guarantees against excessive bails and fines and cruel and unusual punishment (*Wong Wing v. United States, supra*); but the right to trial by jury and protections against cruel and unusual punishments do not apply or extend to deportation proceedings. *Fong Yue Ting v. United States,* 149 U.S. 698, 37 L. Ed. 905, 13 S. Ct. 1016 (1893). *See* 3 Am. Jur. 2d *Aliens and Citizens* § 7 (1962). Resident aliens are entitled to the protection of our laws in their persons and effects. *Carlson v. Landon,* 342 U.S. 524, 96 L. Ed. 547, 72 S. Ct. 525 (1952). Denying these basic protections to aliens would constitute an invidious discrimination. *Yick Wo v. Hopkins,* 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). An alien is entitled to habeas corpus, the same as a citizen. U.S. Const. art. 1, § 9, clause 2; *Wong Wing v. United States, supra; Sherman v. Hamilton,* 295 F.2d 516 (1st Cir. 1961); *cert. denied,* 369 U.S. 820, 7 L. Ed. 2d 785, 82 S. Ct. 827 (1962).

But the equal protection provisions of both constitutions do not forbid all distinctions in state law between citizens and resident aliens. *Cockrill v. California,* 268 U.S. 258, 69 L. Ed. 944, 45 S. Ct. 490 (1925); *Terrace v. Thompson, supra.* Thus, where the entry of certain aliens would have

been lawful, a state statute prohibiting any persons from coming into the state from a foreign country while infected with a contagious disease was held to be a legitimate exercise of the police power. *Compagnie Francaise de Navigation à Vapeur v. State Bd. of Health,* 51 La. Ann. 645, 25 So. 591 (1899), *aff'd,* 186 U.S. 380, 46 L. Ed. 1209, 22 S. Ct. 811 (1902). That the power to naturalize—as earlier noted —is exclusive with the Congress to be exercised uniformly throughout the United States (*United States v. Wong Kim Ark,* 169 U.S. 649, 42 L. Ed. 890, 18 S. Ct. 456 (1898); *Boyd v. Nebraska ex rel. Thayer,* 143 U.S. 135, 36 L. Ed. 103, 12 S. Ct. 375 (1892); *Schneider v. Rusk,* 377 U.S. 163, 12 L. Ed. 2d 218, 84 S. Ct. 1187 (1964)), should not abrogate the major constitutional powers of self-government reserved to the states in the constitution.

There is a discernible line separating rights and privileges guaranteed resident aliens under the constitutions and those guaranteed a citizen as a birthright or by naturalization. Limiting the professional civil service, as the Seattle charter does, to citizens does not, so far as I can see, cross that line or intrude upon any of these protections or deprive an alien of due process of law. Thus, the alien and the citizen alike are on the same side of a line delineated to indicate those rights which directly operate upon and militate to sustain individual freedom and afford direct protection against oppression by the state. But with respect to other rights, privileges, immunities and duties, the legislative power may recognize distinctions between alien and citizen.

Section 1 of the Fourteenth Amendment, both in text and spirit, preserves these distinctions:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are *citizens* of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities *of citizens of the United States;* nor shall any state deprive any *person* of life, liberty, or property, without due process of law; nor deny

to any *person* within its jurisdiction the equal protection of the laws.

(Italics mine.) Thus, the line of demarcation between citizens and noncitizens is made clear. The privileges and immunities of citizens shall not be abridged, but everyone, whether alien or citizen, cannot be denied life, liberty or property without due process of law, nor deprived of equal protection of the law.

To hold, as I think the court does, that equal protection of the law means that virtually all distinctions between citizens and aliens are abolished, reads an idle redundancy into the Fourteenth Amendment and creates a manifest absurdity. It operates to abolish the essential distinctions in law between alien and citizen and, in doing so, removes one of the basic motives for attaining citizenship. Not only where there is a direct public interest but also where the police power is directly involved or where the subject matter relates to the public safety, health and welfare, may aliens be excluded or subjected to qualifying conditions not required of citizens. *See Chy Lung v. Freeman*, 92 U.S. 275, 23 L. Ed. 550 (1875). Thus, if the legislature is dealing with matters of inherent public danger, it may make classifications based on domicil, allegiance, duty, habits and such other factors as may bear a rational connection to the protection sought to be effected. Both the United States and the states have the right, in legislating upon the subject of immigration and naturalization, to assume the existence of a relationship between one's native culture, customs and ability to adapt to our laws and institutions and the length of the alien's sojourn in this country before naturalization may be accomplished; that time is a relevant factor in encouraging and fostering adherence to the law and the constitutions. By its very nature, citizenship relates to questions of allegiance and acceptance of local and national law and culture and the adaptation of personal habits and life patterns to life in this country. Fixing a minimal time for naturalization makes rational distinctions between citizen and resident alien under both federal and state policy and

there is nothing in the Fourteenth Amendment which appears to preclude such demarcation. *Ohio ex rel. Clarke v. Deckebach,* 274 U.S. 392, 71 L. Ed. 1115, 47 S. Ct. 630 (1927); *State v. Rheaume,* 80 N.H. 319, 116 A. 758 (1922). Thus, the protections and guarantees against arbitrary governmental action which apply to alien and citizen alike such as the right to trial by jury, right to counsel in felony cases, right to compulsory process for witnesses, freedom from compulsory self-incrimination and cruel and unusual punishments arise not only by constitution, treaty or statute but by a recognition that all civilized states are bound to afford these protections to all who come within their jurisdiction, whether there temporarily, illegally or accidentally. These are the protections which constitute the main elements of due process and equal protection of law; and it would be shameful and, indeed, beneath the dignity of this democracy even though there were no Fourteenth Amendment if those who came here could be subjected by the states or the United States to tyranny, oppression and denial of the basic human rights which our laws afford all citizens. But the right to permanent employment in the Seattle civil service as a professional engineer is not among any of these guarantees.

Plaintiffs, as resident aliens in Seattle but citizens and subjects of the Republic of China, educated and trained in engineering, claim in essence that, in being denied the right to compete on equal terms with citizens for appointment to and employment in the Seattle civil service they are being denied not any rights and privileges granted them by treaty laws but those basic rights shared under our constitutions by all citizens. A city, they contend, is without constitutional right to restrict its civil service for professional engineers to citizens of the United States for such a classification, they imply, amounts to an invidious discrimination. As earlier observed, the line of demarcation separating citizens of the United States from resident aliens under our constitutions is quite clear. A state, I think, may constitutionally prohibit aliens from holding public office,

administrative or elective. It may deny him the right to serve as a juror or grand juror; or the right to kill wild animals, except in self-defense, and deny the possession of firearms for use in hunting the wild animals and birds. *Patsone v. Pennsylvania,* 232 U.S. 138, 58 L. Ed. 539, 34 S. Ct. 281 (1914). Although a state cannot discriminate against resident aliens by depriving them of the ordinary means of livelihood with private employers such as cooking in a restaurant (*Truax v. Raich,* 239 U.S. 33, 60 L. Ed. 131, 36 S. Ct. 7 (1915)), employment as a professional engineer in public service cannot sensibly be said to be an ordinary means of livelihood from an ordinary employer. Even when the employment is private, if it is subject to regulation under the police power as one identified with the public welfare, it may be restricted to United States citizens. *People v. Crane,* 214 N.Y. 154, 108 N.E. 427 (1915), *aff'd,* 239 U.S. 195, 60 L. Ed. 218, 36 S. Ct. 85 (1915). Thus, although aliens may not be denied the right to engage in selling soft drinks, they may constitutionally be denied licenses to sell intoxicants, or operate poolrooms. *Ohio ex rel. Clarke v. Deckebach, supra.*

The court's opinion depends in a large degree upon three decisions, none of which applies, I think, whatever to the Seattle City Charter: *Truax v. Raich, supra; Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948); and *Purdy & Fitzpatrick v. State,* 71 Cal. 2d 566, 79 Cal. Rptr. 77, 456 P.2d 645 (1969).

In *Truax,* one Raich, a native of Austria, lawfully in the United States, and living in Bisbee, Arizona, was employed as a cook by Truax in the latter's restaurant. Of Truax's nine restaurant employees, seven were aliens. By a 1914 statute, Arizona required that 80 per cent of the employees had to be citizens of the United States "regardless of kind or class of work." The statute made it a misdemeanor for the employer to violate this provision or the employee to misrepresent his "nativity or citizenship," and fixed punishment at a fine of *not less than* $100 and imprisonment *for not less* than 30 days. Truax was arrested for employing

Raich. Raich, threatened with loss of his job, thereupon brought suit in the federal district court to enjoin enforcement of the statute as being discriminatory against him under the Fourteenth Amendment.

That *Truax* has little or nothing to do with citizenship requirements in the public service and is limited to ordinary private callings—particularly characterized in the opinion as one of "the common occupations of the community"—is clear from the language employed:

> The discrimination defined by the act does not pertain to the regulation or distribution of the public domain, or of the common property or resources of the people of the State, the enjoyment of which may be limited to its citizens as against both aliens and the citizens of other States. Thus in *McCready* v. *Virginia,* 94 U. S. 391, 396, the restriction to the citizens of Virginia of the right to plant oysters in one of its rivers was sustained upon the ground that the regulation related to the common property of the citizens of the State, and an analogous principle was involved in *Patsone* v. *Pennsylvania,* 232 U. S. 138, 145, 146, where the discrimination against aliens upheld by the court had for its object the protection of wild game within the States with respect to which it was said that the State could exercise its preserving power for the benefit of its own citizens if it pleased. The case now presented is not within these decisions, or within those relating to the devolution of real property (*Hauenstein* v. *Lynham,* 100 U. S. 483; *Blythe* v. *Hinckley,* 180 U. S. 333, 341, 342); *and it should be added that the act is not limited to persons who are engaged on public work or receive the benefit of public moneys. The discrimination here involved is imposed upon the conduct of ordinary private enterprise.*

(Italics mine.)

After pointing out that the main purpose of the statute would be to force the complainant "out of his employment as a cook in a restaurant, simply because he is an alien," the court made a distinction which I think clinches the difference between that case and this: "No special public interest with respect to any particular business is shown

that could possibly be deemed to support the enactment, for as we have said it relates to every sort."

Citing *Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971), the court asserts that its opinion rests not on constitutional principles, but rather on a doctrine of federal preemption. *Graham,* I believe, however, stands directly upon the equal protection clause of the Fourteenth Amendment and holds that, under it, aliens cannot be deprived of public assistance by the states in the absence of a compelling state interest. *Graham* may be cited, I think, for the proposition that public assistance is not to be equated with the professional civil service and that there does exist a compelling state and municipal interest enabling the City of Seattle to require that its professional civil service engineers be citizens of the United States.

This court relies substantially, too, upon *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948). There, California in 1947 had enacted a statute barring the issuance of commercial fishing licenses to persons "ineligible to citizenship." Prior to that enactment, commercial fishing licenses had been issued without regard to alienage or ineligibility to citizenship and Takahashi had been fishing regularly since 1915 under such a license in the ocean waters both within and outside the 3-mile limit off the coast of California, bringing his fish ashore in that state for sale. After the war and during a period when, under the immigration and naturalization laws of the United States, Japanese nationals, regardless of their length of residence here, were ineligible for citizenship, Takahashi applied for his commercial fishing license entitling him to fish in the ocean off the coast of California and sell his catch in the state. The state refused—not because he was an alien—but because he was of a class of aliens ineligible then to ever become citizens of the United States.

*Takahashi,* I think a sound decision. It rests squarely upon the premise that, although Congress may constitutionally classify and discriminate with respect to nationality in

its entry policies, the states may not do so with reference to aliens once they are here. *Takahashi* holds that all aliens lawfully here must be treated alike. That is what the court means when it says:

> The state's law here cannot be supported in the employment of this legislative authority because of policies adopted by Congress in the exercise of its power to treat separately and differently with aliens from countries composed of peoples of many diverse cultures, races, and colors.

(334 U.S. at 420.)

Seattle's charter gives no hint of such an invidiously discriminatory classification among aliens as was revealed in *Takahashi*; one group of resident aliens is not given preference over another. The charter treats all aliens alike with respect to the civil service.

Not to be overlooked, also in *Takahashi,* is the statement that the court was "unable to find that the 'special public interest' on which California relies provides support for this state ban on Takahashi's commercial fishing." Holding that California's claim of special public interest through a collective claim of ownership by its citizens in ocean fish swimming inside the 3-mile limit is extremely tenuous, the court referred to overriding federal interests in migratory birds sustained under the Federal Migratory Bird Treaty Act, 40 Stat. 755 (1918); *Missouri v. Holland*, 252 U.S. 416, 64 L. Ed. 641, 40 S. Ct. 382, 11 A.L.R. 984 (1920).

And, while questioning California's ownership of ocean fish in the waters off the California coast, the court did reaffirm the existence in the states of an abiding special public interest in wild game:

> In the absence of overriding federal treaties, this Court sustained a state law barring aliens from hunting wild game in the interest of conserving game for citizens of the state against due process and equal protection challenges. *Patsone* v. *Pennsylvania*, 232 U. S. 138.

(334 U.S. at 421.)

In the third case, *Purdy & Fitzpatrick v. State*, 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77 (1969), which cites

*Truax* and *Takahashi,* the Supreme Court of California held unconstitutional a statute barring contractors from employing aliens on public works projects. There, certain private employers had undertaken the performance of a public contract, employing some aliens on the project. The opinion rests partly upon the idea that, in one way or another, the statute interfered with the regulatory scheme set up by the Congress in exercising its exclusive power over immigration and naturalization but bypasses the question of the state's "special public interest." At no point does the opinion suggest or imply that there is no special public interest in professional employment in the state's civil service; nor is the case authority for the proposition that resident aliens admitted to this country for the "purpose of performing skilled or unskilled labor" upon the certificate of the Secretary of Labor are entitled under the Fourteenth Amendment to employment in the civil service.

A state cannot deny to aliens the right to earn a living in ordinary occupations in private employment or business. But "where the work is public and therefore wholly subject to the police power, the exclusion of aliens is justifiable . . . The equal protection clause does not estop a governmental body from preferring citizens over aliens in the matter of employment." 3 Am. Jur. 2d *Aliens and Citizens* § 38 (1962). Employees of a municipality do not have a vested right to public employment. *State ex rel. Ford v. King County,* 47 Wn.2d 911, 290 P.2d 465 (1955). The question of whether the City of Seattle may constitutionally restrict its employment of professional engineers in the city civil service has, I think, been long resolved. If the plaintiffs, or the people, feel that such a policy is unfair and unwarranted, they may change their charter or submit their views to the legislature.

I would affirm.

HUNTER, J., concurs with HALE, J.

Petition for rehearing denied November 5, 1971.