[No. 42051. En Banc. July 27, 1972.]

JAMES H. HERRIOTT et al., *Appellants,* v. THE CITY OF SEATTLE et al., *Respondents.*

*Lycette, Diamond & Sylvester,* by *Lyle L. Iversen,* for appellants.

*A. L. Newbould, John P. Harris,* and *James M. Taylor,* for respondents.

STAFFORD, J.—Eligibility to take Seattle's civil service examinations is limited to citizens of the United States. This appeal involves the validity of provisions in the city's charter and civil service rules which create such limitation.

Both appellants are aliens who lawfully reside in the United States and who have applied to become naturalized citizens. Each is a taxpayer of King County, Washington. Both are "provisionally" employed by the city as transit operators and each is a competent worker. Their duties are such that they can be performed as well by them as by citizens. No issue of security is involved.

Appellants Herriott and Ramsay have been continuously employed by the city from 1966 and 1968 respectively. They were initially employed during a period of relatively full employment. Changing economic conditions, however, brought forth a number of citizen applicants seeking permanent civil service employment as transit operators. A list of persons eligible for permanent civil service employment in such positions was made available to the appointing authority and appellants were notified that, effective June 12, 1970, they would be discharged as "provisional employees".

Appellants filed requests to take the required civil service examination. Their applications were rejected by the city's civil service commission solely because they were not citizens of the United States.

Appellants brought this action to enjoin the city from discharging them and to have provisions of the charter and rules, making citizenship a requirement for taking[1] the civil service examination, declared void. They appeal from a judgment dismissing their complaint. The city was temporarily enjoined, however, from dismissing appellants pending the outcome of this appeal.

The challenged provisions are the same as those involved in *Hsieh v. Civil Serv. Comm'n*, 79 Wn.2d 529, 530, 488 P.2d 515 (1971):

---

[1] We are concerned only with appellants' eligibility to take the civil service examination. We make no attempt to pass upon their civil service qualifications. We have no way of knowing whether the appellants, being authorized to take the examination, will successfully pass it or meet the requirements, other than citizenship, for admission to the city's civil service system.

Article 16, § 6 of the Seattle City Charter provides in part:

All applicants for offices or places in the classified civil service shall be subject to examination, which shall be public, competitive and open to all citizens of the United States with specified limitations as to residence, age, health, habits and moral character . . .

Civil service rule 4.01, adopted pursuant to charter authority, provides that in order to qualify for examination the applicant must be a citizen of the United States. Rule 7.07 allows provisional employment of noncivil service persons when there is no suitable eligible register of regular civil service personnel available. Such provisional employment is restricted to 60-day, renewable periods, pending availability of an "adequate eligible register," and must cease within 21 days after notice that a regular civil service employee is available, unless an extension is granted by the secretary of the civil service department.

However, *Hsieh* does not resolve the issues currently before us. In that case we held that the city's application of the challenged charter and rule provisions to those appellants conflicted with the federal scheme of immigration. In the instant case, however, we are unable to determine whether such a conflict exists.

The Immigration and Nationality Act of 1952 as amended, 8 U.S.C. § 1101 *et seq.* (1970) (hereinafter referred to by sections of United States Code Title 8), is the source of the federal policy upon which we based our decision in *Hsieh.* The act establishes a quota system. Section 1151(a) sets numerical limitations on the total number of immigrants that may be lawfully admitted. However, the apportionment therein is exclusive of "special immigrant"[2] and

---

[2] 8 U.S.C. § 1101 (1970) Definitions. "(a) As used in this chapter—"

". . ."

"(27) The term 'special immigrant' means—

"(A) an immigrant who was born in any independent foreign country of the Western Hemisphere or in the Canal Zone and the spouse and children of any such immigrant, if accompanying, or following to join him: *Provided,* That no immigrant visa shall be issued pursuant to this clause until the consular officer is in receipt of a determination

"immediate relatives"[3] of United States citizens. Section 1153 provides for the allocation of immigrant visas in "preference" categories with percentage limitations subject to the quota in section 1151 (a). There are seven "preference" categories[4] and an eighth "nonpreference" category.[5] Thus, all immigrants admitted into the United States fall into one of four groups: (1) "special immigrants", which includes five subclassifications; (2) "immediate relatives"; (3) immigrants in one of seven "preference" categories; or (4) "nonpreference" immigrants.

The federal scheme regulating the particular aspect of

made by the Secretary of Labor pursuant to the provisions of section 1182(a) (14) of this title;

"(B) an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad;

"(C) an immigrant who was a citizen of the United States and may, under section 1435(a) or 1438 of this title, apply for reacquisition of citizenship;

"(D) (i) an immigrant who continuously for at least two years immediately preceding the time of his application for admission to the United States has been, and who seeks to enter the United States solely for the purpose of carrying on the vocation of minister of a religious denomination, and whose services are needed by such religious denomination having a bona fide organization in the United States; and (ii) the spouse or the child of any such immigrant, if accompanying or following to join him; or

"(E) an immigrant who is an employee, or an honorably retired former employee, of the United States Government abroad, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: *Provided,* That the principal officer of a Foreign Service establishment, in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status."

[3] 8 U.S.C. § 1151(b) (1970). "The 'immediate relatives' referred to in subsection (a) of this section shall mean the children, spouses, and parents of a citizen of the United States: *Provided,* That in the case of parents, such citizen must be at least twenty-one years of age. The immediate relatives specified in this subsection who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations in this chapter."

[4] *See* 8 U.S.C. § 1153(a)(1)-(7) (1970).

[5] *See* 8 U.S.C. § 1153(a)(8) (1970).

immigration discussed in *Hsieh* derives from section 1182 (a) (14).[6] That section requires the Secretary of Labor to make the following determination as a condition precedent to the admission of certain classes of immigrants:

1. That there are not sufficient workers in the United States who are able, willing, qualified and available:

a. At the time of application for a visa; and

b. At the place to which the alien is destined to perform such labor; and

2. That the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

Such determination is required for only four classes of immigrants: (1) "special immigrants" born in an independent country in the Western Hemisphere or Canal Zone (one of five subclasses of "special immigrants"); (2) members of professions or persons with exceptional ability in the sciences or arts (one of seven "preference" categories); (3) qualified immigrants capable of performing specified skilled or unskilled labor needed in the United States (one of seven "preference" categories); and (4) "nonpref-

---

[6]8 U.S.C. § 1182(a) (1970): "Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

" . . .

"(14) Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to special immigrants defined in section 1101(a)(27)(A) of this title (other than the parents, spouses, or children of United States citizens or of aliens lawfully admitted to the United States for permanent residence), to preference immigrant aliens described in sections 1153(a)(3) and 1153(a)(6) of this title, and to nonpreference immigrant aliens described in section 1153(a)(8) of this title;"

erence" immigrants. No other classes of immigrants need to have such determination made to be admitted.

Pursuant to section 1182(a)(14), the Secretary of Labor has promulgated regulations to implement the federal scheme. To reduce delay in processing an alien's request for a visa, the secretary has made the determination required and has published it in three schedules. 29 C.F.R. § 60.

Schedule "A" lists categories of employment for which there is a shortage of workers and in which aliens will not adversely affect the wages and working conditions of similarly employed workers in the United States. 29 C.F.R. § 60.2(a)(1); 29 C.F.R. § 60.6. This schedule, originally published in 1965 and amended in 1966, is in effect until amended and applies to the entire United States unless a specific geographic area is exempted with regard to a specific employment category. 29 C.F.R. § 60.2(b).

Schedule "B" lists categories of employment for which the required determination could not be made at the time of its publication. 29 C.F.R. § 60.2(a)(2); 29 C.F.R. § 60.6.

Schedule "C" is also a precertification list, but unlike Schedule "A", the employment categories in Schedule "C" are under continuous review. Schedule "C" is published at least quarterly. 29 C.F.R. § 60.3(c). Modification in the schedules can be initiated by directing a request to the Secretary of Labor. 29 C.F.R. § 60.2(c).

If immigrants are in one of the four classes for which a determination by the Secretary of Labor is required as a prerequisite for admission and if they are qualified to be in an employment category listed in Schedule "A" or in the appropriate Schedule "C", the requirement in section 1182(a)(14) is satisfied. But if they do not possess skills in categories listed in Schedules "A" or "C", an individual determination must be made in their case. 29 C.F.R. § 60.3.

In *Hsieh v. Civil Serv. Comm'n*, 79 Wn.2d 529, 488 P.2d 515 (1971), the plaintiffs were civil engineers, an employment category listed in the secretary's Schedule "A". We held, at page 532:

federal supremacy in the field of immigration as exercised

by Congress precludes the city from establishing citizenship as a condition to eligibility for civil service examination for general public employment in occupations which have been designated as needed by the Secretary of Labor.

In the instant case, however, appellants are transit operators. That employment category is not listed in Schedules "A" or "B",[7] and the record does not reveal whether it was listed in the appropriate Schedule "C". Further, the record does not reveal that the Secretary of Labor made an individual determination in appellants' case. In fact, the record does not disclose the class of immigrant in which appellants fall. Thus, it is impossible for us to decide whether section 1182(a)(14) applies to them. In the absence of such information we cannot determine whether the citizenship requirement, as applied to these appellants, conflicts with the federal scheme under the Immigration and Nationality Act of 1952.

This hiatus brings us to appellants' contention that the citizenship requirement of the city charter and civil service rules violates the equal protection clause of the Fourteenth Amendment.

■ It is not questioned that the city's act of excluding aliens from civil service is within the ambit of the Fourteenth Amendment. *Hsieh v. Civil Serv. Comm'n, supra.* The equal protection clause applies to resident aliens as well as citizens. *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 420, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948); *Truax v. Raich,* 239 U.S. 33, 39, 60 L. Ed. 131, 36 S. Ct. 7 (1915); *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). As stated by Justice Murphy's concurring opinion in *Bridges v. Wixon,* 326 U.S. 135, 161, 89 L. Ed. 2103, 65 S. Ct. 1443 (1945):

Since an alien obviously brings with him no constitutional rights, Congress may exclude him in the first in-

---

[7]Schedule "B" includes and defines the category "Street Railway and Bus Conductors" but does not include "bus operators." No reason for the fine distinction is given. 29 C.F.R. § 60.6.

stance for whatever reason it sees fit. *Turner* v. *Williams*, 194 U. S. 279. The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.

Since the turn of the century, the United States Supreme Court has been solicitous of the economic rights of aliens under the constitution.[8] In *Truax v. Raich, supra,* the court invalidated an Arizona statute which provided that if one employed five or more employees, not less than 80 percent thereof must be citizens. Basing its decision on the equal protection clause, the court stated at page 41:

It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure.

The court, however, allowed an exception if the state could show a "special public interest" with respect to a particular business.

The "special public interest" exception remained the court's rationale in decisions sustaining the citizenship requirements of employment until its erosion began in *Takahashi v. Fish & Game Comm'n, supra,* and culminated in

---

[8]*See* M. Konvitz, The Alien and the Asiatic in American Law, 171-221 (1946); Comment, *Equal Protection and Supremacy Clause Limitations on State Legislation Restricting Aliens,* Utah L. Rev. 136 (1970); *National Power to Control State Discrimination Against Foreign Goods and Persons: A Study in Federalism,* 12 Stan. L. Rev. 355 (1960); Comment, *Constitutionality of Restrictions on Aliens' Right to Work,* 57 Colum. L. Rev. 1012 (1957); Note, *1947-48 Term of the Supreme Court: The Alien's Right to Work,* 49 Colum. L. Rev. 257 (1949).

*Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971).

In *Heim v. McCall,* 239 U.S. 175, 60 L. Ed. 206, 36 S. Ct. 78 (1915) and *Crane v. New York,* 239 U.S. 195, 60 L. Ed. 218, 36 S. Ct. 85 (1915) the court upheld the constitutionality of a New York statute restricting employment, in public works, to citizens of the United States. In *Ohio ex rel. Clarke v. Deckebach,* 274 U.S. 392, 71 L. Ed. 1115, 47 S. Ct. 630 (1927), the court held constitutional an ordinance of the city of Cincinnati which prohibited the issuance, to aliens, of licenses to conduct pool and billiard rooms.[9]

*Heim* and *Crane* were companion cases. In upholding the statute, then Chief Judge Cardozo, writing for the New York Court of Appeals, observed that:

Whatever is a privilege rather than a right, may be made dependent upon citizenship.

*People v. Crane,* 214 N.Y. 154, 164, 108 N.E. 427, 430 (1915). In affirming the New York court, Mr. Justice McKenna, writing for the United States Supreme Court in the companion case of *Heim,* adopted a slightly different approach. He reasoned that the state could " 'prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities.' " *Heim v. McCall,* 239 U.S. 175, 191, 60 L. Ed. 206, 36 S. Ct. 78 (1915).

The reasoning of both Chief Judge Cardozo and Justice McKenna formed the basis for this court's opinion in *Cornelius v. Seattle,* 123 Wash. 550, 213 P. 17 (1923). There we held that Seattle's restriction of franchises, for the collection of swill, to citizens was not violative of the equal protection clause.

---

[9]The "special public interest" protected in *Ohio ex rel. Clarke v. Deckebach,* 274 U.S. 392, 71 L. Ed. 1115, 47 S. Ct. 630 (1927) was the power of the state to regulate occupations which it considers harmful, vicious, or antisocial. *See* M. Konvitz, The Alien and the Asiatic in American Law 175-81 (1946); Comment, *Equal Protection and Supremacy Clause Limitations on State Legislation Restricting Aliens,* Utah L. Rev. 136, 137 (1970). The type of occupation considered in *Clarke* is not before the court in this appeal and we express no opinion about the continuing validity of the "special public interest" doctrine as applied there.

*Cornelius* relied on *Jahn v. Seattle,* 120 Wash. 403, 207 P. 667 (1922), which had upheld the city's power to require private contractors on public works projects to pay their employees at a rate no less than that paid by the city for work of like character. The *Jahn* decision had been based on Mr. Justice McKenna's reasoning in *Heim* and *Crane.* In *Hsieh v. Civil Serv. Comm'n,* 79 Wn.2d 529, 488 P.2d 515 (1971), at 533-34, we acknowledge that *Cornelius'* reliance on *Jahn* was inappropriate.

Further developments in the law of alien rights, subsequent to *Cornelius,* have made inappropriate our reliance, in that opinion, on the right-privilege distinction articulated by Chief Judge Cardozo.

In *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948), the court voided a California statute which denied commercial fishing licenses to all aliens ineligible to become citizens. The statute's effect had been to discriminate against Japanese aliens, since federal immigration policy made them ineligible for citizenship. The state sought to sustain the validity of its classification under an alleged "special public interest" in owning and conserving its fishery resource. The court rejected the state's contention, finding, at page 421, that whatever "special public interest" California had by reason of its ownership of the fish was inadequate to justify the exclusion of "any or all aliens who are lawful residents of the State from making a living by fishing in the ocean off its shores while permitting all others to do so."

Recognizing the rejection of the "special public interest" doctrine in *Takahashi,* the California Supreme Court subsequently ruled that a statute prohibiting the employment of aliens in public works projects, except in emergencies, violated the equal protection clause as well as the federal immigration policy. *Purdy & Fitzpatrick v. State,* 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77 (1969). The court found in *Purdy* that the fact of alienage bore no rational relationship to the suitability of those who work upon public projects or the need of the laborer for such employment.

The position of the California court was recently reinforced by the United States Supreme Court in *Graham v. Richardson*, 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971). *Graham* held that a state law denying welfare benefits solely on the basis of alienage was violative of the equal protection clause. In so holding, the court expressly rejected the "special public interest" doctrine thereby seriously undermining the precedential value of both *Heim* and *Crane*.

In *Graham* the court stated at page 372:

It is true that this Court on occasion has upheld state statutes that treat citizens and noncitizens differently, the ground for distinction having been that such laws were necessary to protect special interests of the State or its citizens.

Nevertheless, after discussing *Heim* and *Crane*, the court went on to say, at page 374:

*Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410 (1948), however, cast doubt on the continuing validity of the special public-interest doctrine in all contexts. . . .

. . .

. . . the special public interest doctrine was heavily grounded on the notion that "[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship." *People* v. *Crane*, 214 N. Y., at 164, 108 N. E., at 430. But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege."

The clear policy of the United States Supreme Court to apply the guarantees of the Fourteenth Amendment to protection of the economic rights of aliens, and particularly the court's rejection of the "special public interest doctrine," undermine our holding in *Cornelius v. Seattle, supra*. We, therefore, expressly overrule that portion of *Cornelius* which holds that the citizenship requirement, as applied therein, did not violate the equal protection clause of our state and federal constitutions.

In so doing, we adopt the more modern approach of the

California court in *Purdy & Fitzpatrick v. State, supra* at 581. That case observed with much common sense:

> May the state simply favor its own citizens in the disbursement of public funds? First, since aliens support the State of California with their tax dollars, any preference in the disbursement of public funds which excludes aliens appears manifestly unfair . . . any classification which treats all aliens as undeserving and all United States citizens as deserving rests upon a very questionable basis. The citizen may be a newcomer to the state who has little "stake" in the community; the alien may be a resident who has lived in California for a lengthy period, paid taxes, served in our armed forces, demonstrated his worth as a constructive human being, and contributed much to the growth and development of the state.

(Footnotes omitted.) We have long since passed that time in history when resident aliens of Boston were met with signs which read: "Help wanted—Irish need not apply here for work!"

█ Equal protection of the laws under our state and federal constitutions requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. *See generally, Development in the Law—Equal Protection*, 82 Harv. L. Rev. 1065, 1076 (1969). Without question states retain broad discretion to classify so long as their classifications have a reasonable basis. *McGowan v. Maryland*, 366 U.S. 420, 425-27, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961); *Morey v. Doud*, 354 U.S. 457, 465, 1 L. Ed. 2d 1485, 77 S. Ct. 1344 (1957). They bear, however, the burden of establishing that their classification constitutes a necessary means of accomplishing a legitimate state interest. *Loving v. Virginia*, 388 U.S. 1, 11, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 196, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964). Further, a classification based on alienage is inherently suspect and subject to close judicial scrutiny. *Graham v. Richardson*, 403 U.S. 365, 372, 29 L. Ed. 2d 534, 91 S. Ct. 1848

(1971); *Hsieh v. Civil Serv. Comm'n,* 79 Wn.2d 529, 535, 488 P.2d 515 (1971).

■ The Seattle charter and civil service rule create two classes of civil service applicants indistinguishable except with respect to whether they are United States citizens. To sustain this classification there must be shown to be a reasonable relationship between the citizenship requirement and an applicant's qualification to take the civil service examination for a position of general employment with the city.

The city has not sustained its burden of showing such reasonable relationship here. The purpose of civil service is to establish a merit system of public employment in the matter of the selection, appointment, discipline and discharge of civil employees. *Gogerty v. Department of Inst.,* 71 Wn.2d 1, 4-5, 426 P.2d 476 (1967); *State ex rel. Voris v. Seattle,* 74 Wash. 199, 204, 133 P. 11, 4 A.L.R. 198 (1913). It is thought that elimination of the arbitrary employment procedures of the spoils system enables state, county, and municipal governments to render more efficient services to the public. *Civil Serv. Comm'n v. Foley,* 75 Ariz. 364, 371, 257 P.2d 384 (1953). The citizenship requirement in no way relates to these legitimate ends in the area of general employment.

■ Citizenship is the status accorded those persons entitled to participate in the act of governing. Citizens are members of a *political* community "who, in their associated capacity, have established or submitted themselves to the dominion of a government for the promotion of their general welfare and the protection of their individual as well as their collective rights." *United States v. Cruikshank,* 92 U.S. (2 Otto) 542, 549, 23 L. Ed. 588 (1875). *See also Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 165-66, 22 L. Ed. 627 (1874).

The critical attribute which distinguishes the citizen from the alien is that the citizen possesses *political* rights:

a citizen in a democratic society is one who enjoys,

among his privileges and immunities, the right to participate in the formulation of the legal norms—public and private—to which he is responsible. In the American scheme, an alien is not granted full membership in the sovereign people but, under the Equal Protection Clause, is granted limited membership in that body. He does not enjoy full political rights and may reside in the country only at the sufferance of the national government, but his private rights are protected from unreasonable state action during that residence.[10]

These political rights include the right to vote,[11] to hold elective office and to serve as a juror. They differ from private or civil rights held by aliens in common with citizens, such as the right not to be excluded from employment solely on the ground of alienage,[12] to hold property,[13] and, if qualified, to receive public assistance.[14]

In addition to the distinction based on the exercise of political rights, citizens are distinguished from aliens in the allegiance they owe this country. The duty of allegiance owed by the citizen is an absolute and permanent obligation whereas the duty of allegiance owed by the alien, while domiciled in this country, is local and temporary.[15]

[10]Stout, *Privileges and Immunities of National Citizenship and the Suffrage in the States,* 14 U. Pitt. L. Rev. 48, 69 (1952).

[11]The franchise as a badge of citizenship has, however, only recently come into full recognition. During the nineteenth century the laws and constitutions of at least 22 states and territories granted aliens or declarant aliens the right to vote. M. Konvitz, The Alien and the Asiatic in American Law 1 (1946).
*See also United States v. Valentine,* 288 F. Supp. 957, 980 (D.P.R. 1968). *But see* Stout, *Privileges and Immunities of National Citizenship and the Suffrage in the States,* 14 U. Pitt. L. Rev. 48 (1952).

[12]*Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948); *Truax v. Raich,* 239 U.S. 33, 60 L. Ed. 131, 36 S. Ct. 7 (1915).

[13]Const. art. 2, § 33 (amendment 42); *Oyama v. California,* 332 U.S. 633, 92 L. Ed. 249, 68 S. Ct. 269 (1948).

[14]*Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971).

[15]Although an alien's allegiance may be temporary, the quality of the allegiance required of him does not materially differ from that required of native-born or naturalized citizens. *Eisler v. United States,*

*Carlisle v. United States,* 83 U.S. (16 Wall.) 147, 154, 21 L. Ed. 426 (1872).

■ Exercise of political rights and fidelity of allegiance, the characteristics that distinguish the citizen from the alien, bear no rational relationship to qualification to take a civil service examination for a position in general public employment[16] which does not rise to the status of public office or which involves no requirement of security.

The position of transit operator is a position of general employment that neither rises to the status of public office nor involves a requirement of security. Application of the citizenship requirement to these appellants, therefore, violates their constitutionally guaranteed right to equal protection of the laws.

The city must permit appellants to take the civil service examination for the position of transit operator. Whether appellants attain civil service status will depend on their performance in the examination and their compliance with requirements, other than citizenship, for admission to the city's civil service.

The judgment is reversed and the cause remanded for disposition consistent with this opinion.

HAMILTON, C.J., ROSELLINI, HUNTER, NEILL, and WRIGHT, JJ., concur.

NEILL, J. (special concurrence)—I have signed the majority opinion, but point out that appellants are resident aliens who have applied for United States citizenship. We

---

170 F.2d 273, 279 (D.C. Cir. 1948). An alien may be drafted to serve in the armed forces (50 App. U.S.C. § 454 (1970)) where he must take an oath to "support and defend the Constitution of the United States." *See e.g.,* 10 U.S.C. § 502 (1970) (oath for all enlistees); 5 U.S.C. § 3331 (1966) (oath for officers; aliens may serve as reserve officers, 10 U.S.C. § 591(b)(1) (1970)). *But see* 50 App. U.S.C. § 455 (1970), allowing alien doctors and dentists to become commissioned officers in the Regular Armed Forces, but providing that they may take a different (unspecified) oath prescribed by the Secretary of Defense.

[16]*See Hsieh v. Civil Serv. Comm'n,* 79 Wn.2d 529, 534 n.2, 488 P.2d 515 (1971).

are expressing no opinion as to the right to public employment of a resident alien who does not elect to apply for citizenship. Neither does this case involve the right of a city to establish preferences in its classified service for persons on eligibility lists who have attained or are seeking American citizenship. These issues await a proper case.

HAMILTON, C.J., HUNTER and WRIGHT, JJ., concur with NEILL, J.

HALE, J. (dissenting)—The court holds that the state or a city cannot constitutionally prescribe American citizenship for the permanent civil service. In so deciding, the court seems unaware that aliens, admitted to this country for permanent residence, in due time may but are under no compulsion to become citizens of the United States. Thus, an alien admitted to this country for permanent residence, possibly harboring a hatred and contempt for this country and its institutions and retaining undivided loyalty and devotion to his country of origin or to another nation, somehow acquires a constitutional right—which he never had before—to permanent employment in the Seattle civil service.

The court's opinion reminds one of a familiar Seattle scene during the mid-'30s when highly-trained, young, German technologists were seen standing at the Nazi salute in beer gardens and rathskellers as the musicians played the Horst Wessel song. Curiously, they would have been denied appointment then to the state and municipal civil service for want of American citizenship under the identical constitutional provisions which the court says must be granted them now.

That an alien has a right under the Fourteenth Amendment's equal protection clause not to be denied work in a privately operated restaurant on the sole basis of alienage (*Truax v. Raich*, 239 U.S. 33, 60 L. Ed. 131, 36 S. Ct. 7 (1915)); to obtain and act under a state fishing license if ineligible to citizenship (*Takahashi v. Fish & Game*

*Comm'n,* 334 U.S. 410, 92 L. Ed. 1478, 68 S. Ct. 1138 (1948)); to work for private employers on publicly-financed construction contracts *(Purdy & Fitzpatrick v. State,* 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77 (1969)); and to share equally with citizens of the United States in the public assistance benefits provided in substantial part by the states *(Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971)), means no more than that he has rights which stop far short of active participation in government.

There was always thought to exist in legal circles a final line of distinction in the constitution between alien and American citizen. Without the change in so much as a solitary word of the state constitution, that line has now been virtually erased in this state. It remained for this court to deliver the coup de grace to preservation of that fundamental distinction between aliens and citizens—permanent professional employment in the public service *(Hsieh v. Civil Serv. Comm'n,* 79 Wn.2d 529, 488 P.2d 515 (1971)), and the privilege of practicing law—a calling always held by the courts as one affected with the public interest. *In re Chi-Dooh Li,* 79 Wn.2d 561, 488 P.2d 259 (1971).

In striking down the requirement of American citizenship for those who would work in and for the government, the court completely ignores a basic principle of constitutional law that "Equal protection does not require identity of treatment." *Walters v. St. Louis,* 347 U.S. 231, 237, 98 L. Ed. 660, 74 S. Ct. 505 (1954). The very act of classification involves some degree of discrimination. Equal protection requires only that classification rest on real and not feigned differences; and that the distinction have some relevance to the purpose for which the classification is made. *Walters v. St. Louis, supra.* The prohibition of the equal protection clause goes no further than *invidious* discrimination. *Markham Advertising Co. v. State,* 73 Wn.2d 405, 439 P.2d 248 (1968). As long as the classifications are reasonable, and

apply equally to all of those within the class, the legislation is within the equal protection of the Fourteenth Amendment. *State v. Ames,* 47 Wash. 328, 92 P. 137 (1907); *Terrace v. Thompson,* 263 U.S. 197, 68 L. Ed. 255, 44 S. Ct. 15 (1923); *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), *cert. denied,* 364 U.S. 932, 5 L. Ed. 2d 365, 81 S. Ct. 379 (1961); *Hemphill v. State Tax Comm'n,* 65 Wn.2d 889, 400 P.2d 297 (1965).

Our constitutions recognize the differences between alien and citizen, both in their privileges and in their obligations to this country; they recognize, too, that these differences are real and not feigned; and that it is no invidious discrimination to reserve the jobs in the public service for American citizens. Conversely, it does constitute an invidious discrimination against American citizens, I think, to rule that they must, despite charter, statute or constitutional provision, compete for employment in the public service with aliens from throughout the world, aliens who simply have done no more than obtain entry for permanent residence here on an immigration quota.

The present case does not concern an alien's basic rights to trial by jury, counsel and witnesses, freedom from compulsory incrimination in criminal cases and other freedoms guaranteed him under the Bill of Rights and the Fourteenth Amendment and generally recognized in all civilized countries as inalienable to the individual. Nor does this case concern an alien's right to earn a living in private employment; nor to draw public assistance from the public treasury. But judicial interpretation vindicating these personal, individual rights affords no rational basis whatever for declaring that they include the right to vote, run for office, or engage in governmental operation within the civil service. Time enough for the assertion of these latter rights and privileges when the alien has taken the oath of allegiance, renounced his former loyalties, and become a citizen. What the court has done here is to lump together under the Fourteenth Amendment all of the rights and privileges guaranteed citizens and aliens separately, so that there ex-

ists no genuine constitutional basis whatever for precluding anyone from the practice of law or joining the civil service, or voting, or holding public office, or serving as a juror, or promoting and signing initiative, referendum and recall petitions.

If aliens have a constitutional right to actively operate the public service or to practice law under the equal protection clause of the Fourteenth Amendment or to participate in government, it follows that an alien applicant to the bar or the Seattle Civil Service Commission has acquired virtually all of the benefits without assuming the obligations of citizenship. In some respects, the court now puts the alien in a superior position to that of the citizen, for it awards him all of the benefits without imposing any of the burdens. Whenever he chooses, an alien, after earning a civil service retirement, may depart this country to resume life in the country to which he has retained his allegiance and loyalty, taking with him all of the benefits of his tenure here and in the meanwhile retaining all of the benefits of citizenship there.

In prescribing American citizenship as a condition for the permanent civil service, the state and its political subdivisions have done no more than exercise their constitutional power to recognize, legislate and classify on the basis of that most vital distinction between citizen and alien: the obligation of allegiance and loyalty to this country and the renunciation of allegiance and loyalty toward all others. The people of this state generally and Seattle in particular in its city charter have simply asserted a basic right of self-government vouchsafed all citizens of this country: the right of local government to keep the control and direction of the business of government in the hands of American citizens.

Accordingly, since the line of demarcation under law between citizen and alien is clear, precise and definitive and represents a most elemental classification upon a rational distinction between alien and citizen, wherein does it contravene the Fourteenth Amendment? To declare as the

court has done that the charter provision restricting the permanent civil service to American citizens violates the constitution not only misconstrues the Fourteenth Amendment, in my opinion, but rewrites it. The Fourteenth Amendment makes the same distinction between citizen and noncitizen that the Seattle charter does:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. *No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;* nor shall any state deprive any *person* of life, liberty, or property, without due process of law; nor deny to any *person* within its jurisdiction the equal protection of the laws.

(Italics mine.) U.S. Const. amend. 14.

In the instant case, the court seems unable to lay to rest entirely some apparent gnawing doubts. It says that driving a transit bus in Seattle does not involve security, implying thereby that, if the Seattle charter limited citizenship to those positions affecting security, the Fourteenth Amendment would countenance such a distinction. But to distinguish between alien and citizen on the basis of security, I think, posits the basic unsoundness of the court's opinion in this case. If the court is holding that, under the Fourteenth Amendment, the city need not accept aliens into positions which can be said to involve security, it necessarily implies that it must do so with those positions which do not. This requires an even more extensive rewriting of the Fourteenth Amendment, and more comprehensive judicial legislation to define security and explain just why it is a denial of equal protection to award the alien civil service status for some jobs and not for others. One can readily assume that firemen and policemen do occupy public positions involving security; so, too, do civil, electrical, hydraulic and sanitary engineers involve security, being in direct control, as they are, of the city's electrical generation, water supply, sanitary installations and highways, dikes, dams and bridges. And what about electricians

and electrical inspectors, and plumbers and plumbing inspectors, and those performing all of the other services rendered by the city to its citizens intended to preserve the public peace, health and safety? And what of food inspection services? And honesty in weights and measures in the millions of dollars in goods sold daily throughout the city?

Under the Fourteenth Amendment, is the court to distinguish along constitutional principles between the Woodland Park policeman and the civil service custodians of the zoo, both doing their respective jobs for the people of Seattle in Woodland Park?

Is it to be held that the Fourteenth Amendment means that the city may restrict the appointment of park policemen to citizens, but cannot do so as to the permanent employees who maintain the gardens and the zoo, and that, although the city need not under the charter hire aliens for the first, it is compelled by the Fourteenth Amendment to hire them for the latter? The reductio ad absurdum of this court's chain of decisions striking down the state's power to restrict certain public callings directly affected with the public interest to American citizens will be seen when circumstances require it to make classifications of public service employment upon the basis of security, excluding some and admitting others. If security be the touchstone of constitutionality, then, under its line of decisions, the court itself in interpreting its decisions will not escape the need to distinguish—or discriminate. I would prefer the clearcut, readily definable distinctions that the city has drawn in its charter between citizen and alien to the nebulous, vague and undoubtedly incomprehensible line of demarcation the court must surely draw in the future.

Assuming, however, that public security, that is, health and safety, is not the major reason for the court's decision, it is still a long leap which carries the court from those cases which sustain statutory abridgment of an alien's rights to hold land (*Cockrill v. California*, 268 U.S. 258, 69 L. Ed. 944, 45 S. Ct. 490 (1925); *Webb v. O'Brien*, 263 U.S. 313, 68 L. Ed. 318, 44 S. Ct. 112 (1923); *Porterfield v. Webb*,

263 U.S. 225, 68 L. Ed. 278, 44 S. Ct. 21 (1923); *Terrace v. Thompson*, 263 U.S. 197, 68 L. Ed. 255, 44 S. Ct. 15 (1923)); or to own stock in agricultural corporations (*Frick v. Webb*, 263 U.S. 326, 68 L. Ed. 323, 44 S. Ct. 115 (1923)); impair his sharing in the state's resources by restricting hunting privileges to citizens of the United States (*Patsone v. Pennsylvania*, 232 U.S. 138, 58 L. Ed. 539, 34 S. Ct. 281 (1914)); prohibit him from planting and harvesting oysters in the state's tidal waters (*McCready v. Virginia*, 94 U.S. 391, 24 L. Ed. 248 (1876)); and render him ineligible for employment in public works (*Heim v. McCall*, 239 U.S. 175, 60 L. Ed. 206, 36 S. Ct. 78 (1915); *Atkin v. Kansas*, 191 U.S. 207, 48 L. Ed. 148, 24 S. Ct. 124 (1903)), to the present holding that a municipality—and the state, therefore—within its sovereign constitutional powers cannot make American citizenship a qualification for employment in the civil service. It is a jump across that basic principle of constitutional law that government can make reasonable classifications and legislate according to them. To exclude aliens from the common occupations of private employment or public assistance is one thing, but it is quite another to say that neither the state nor the people have a special interest in keeping the active operation of their governmental business, performed on or about publicly-owned property with publicly-owned tools and contrivances, wholly paid for from the public treasury, in the exclusive hands of citizens of the United States.

However laudable the purpose, the court ought not overlook that, should its opinion become general law, it may in the long run operate to the detriment of aliens. In periods of inflation, economic recession, and a labor surplus, with consequent overloads of unemployment compensation and public assistance—not to mention invasion of this country, actual or imminent—there is a danger that, if the state and municipal governments must, under the Fourteenth Amendment provide public jobs to aliens on the same basis as to its citizens, drastic but questionable amendatory processes will be initiated of a kind that in the long run may

prove repressive to aliens—or that civil service itself may be drastically curtailed.

No court has gone to such an extreme as does this court. *See Protection of Alien Rights Under the Fourteenth Amendment,* 1971 Duke L.J. (No. 3) 583. None has so cavalierly ignored the cardinal principle of constitutional law stated in *McGowan v. Maryland,* 366 U.S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961):

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. See *Kotch v. Board of River Port Pilot Comm'rs,* 330 U.S. 552; *Metropolitan Casualty Ins. Co. v. Brownell,* 294 U. S. 580; *Lindsley v. National Carbonic Gas Co.,* 220 U. S. 61; *Atchison, T. & S.F. R. Co. v. Matthews,* 174 U. S. 96.

The court loses sight of the fact that a transit driver in Seattle enjoys a higher standard of living, greater economic security for himself and his family, better medical care and educational opportunities, and the enormous boon of political freedom, than do literally thousands of engineers, scientists, lawyers and technologists in Asian, South American, African and most European countries. To thousands of aliens, the Seattle civil service in whatever capacity must seem an extremely desirable appointment and one assiduously to be sought. The court now says that if a civil, electrical or mechanical engineer, fluent in English and here as a permanent resident, gets a higher grade in the civil service examination, he must be employed to the exclusion of a citizen who, because of lesser education, will have a lower grade. And the appointment must, under this decision, be made to the alien who, once here, elects never

to become a citizen but remains on the public payroll until time comes full circle and he departs to his native land with his social security benefits and his Seattle pension, free at last of the burden of American taxes, to live out his days in contentment and comfort.

I think the Fourteenth Amendment was never intended to so nearly erase the distinction between alien and citizen nor to work accordingly so great a corresponding disparagement of American citizenship.

I would, therefore, affirm.

OTT, J. Pro Tem., concurs with HALE, J.