[No. 3877–1.  Division One.  May 23, 1977.]

RACHEL OSTERLOF, *Appellant,* v. UNIVERSITY OF
WASHINGTON, *Respondent.*

*McCutcheon, Groshong, Geisness & Day, Gerald G. Day,*
and *Thomas M. Geisness,* for appellant.

*Slade Gorton, Attorney General,* and *Gerald L. Coe,*
*Assistant,* for respondent.

WILLIAMS, J.—Rachel Osterlof, a publications designer on the staff of the University of Washington, was laid off because of curtailment of work and a decrease in appropriations. She appealed to the Higher Education Personnel Board (RCW 28B.16.120) and from an adverse ruling there to the King County Superior Court, which remanded the cause for further proceedings. The board reconsidered the case, and when it adhered to its original decision, Osterlof again appealed to the Superior Court, which sustained the board's findings, conclusions, and order. This appeal followed.

The facts are these: In 1962, Osterlof was hired to work as an artist in a nonclassified position in the printing department of the university. On April 1, 1968, its printing and publications departments were reorganized, and Osterlof was appointed to a classified (civil service) position in the Department of Publications as a graphic illustrator, subsequently redesignated publications designer. There were four regular employees in the graphics section of the department, a Mr. Auvil, called design supervisor, and three women, one of whom was Osterlof. In addition, a Mr. Walsh was retained as a consultant, at approximately the same rate of pay as the others. On August 12, 1971, when it was necessary to reduce the number of persons in the graphics section by one, Osterlof was laid off.

The first question is whether Mr. Auvil's seniority for layoff purposes was greater than that of the three women. Although the record smacks of discrimination, Auvil had occupied a lead position over the three women for some time prior to the reduction in staff with no protest or appeal. The evidence is adequate to support the board's decision sustaining the determination of the department head that as between Auvil and Osterlof, Osterlof was the one to go.

The second and most important question, recognized as such by the Superior Court which remanded the cause for further proceedings on the point, is whether Walsh should have been the one relieved in the reduction of force rather

than Osterlof. We believe the University was mistaken in retaining Walsh.

The head of the Department of Publications, a Mr. Miller, did not consider separating Walsh because, as he expressed it before the board:

> Well, I have been trying to establish something that would be clear to everyone and yet identify the essence of it. I will probably go amiss, but I felt that because of the unique qualifications and his intelligence, he had the ability and also the emotional and professional detachment, not being a specific captive staff member of the University, to most comprehensively envision how the University could both properly project its image and maintain and reserve the continuity of that image to the public and to the many communities within that public. I felt that although those of us who had the responsibility for carrying out this objective within the University could preserve those things that had to be done, it was only through someone with a special professional development that Frederick Walsh manifested that this could really be achieved in an excellent way. I think we could have done it, but perhaps without the degree of excellence or special quality that we were able to attain with Fred Walsh's particular vision and understanding.

It was for the reasons so expressed by Mr. Miller that Walsh had been retained under a blanket requisition as a "design consultant" for 9 of the 10 years immediately preceding the discharge of Osterlof.

The best description of Walsh's function during those 9 years is supplied by himself:

> The word consultant is misleading. It is just the only way they have of putting a tag on me, because I am actually a working art director and working chief designer. I actually do the work and usually people think of a consultant as only giving advice, and my job is as a working art director and working chief designer.

and again,

> [T]he word "consultant" is confusing because the only function I ever performed for the University was in a working situation. I was actually designing and implementing publications except for my first involvement

with the University. I was hired to make a study of the publications at the request of Dr. Thieme, because the University's publications was so haphazard and disorganized that he felt it needed some evaluation. So I did a study for $500, where I evaluated the University's publications and made a recommendation, a proposal, of what should be done, and at that time which was in 1961, I proposed the establishment of the Office of Publications as it now exists which was as a result of that study.

It is apparent that Walsh did not perform as a consultant, which is defined

as an individual qualified by education, experience, technical ability and temperament to advise and assist on a professional basis in solving specific management and technical problems involving the organization, planning, direction, control and operation of state government. He serves the state executive as an impartial, objective advisor, is not an employee of the state and does not decide, command or control the conduct of the executive's business.

Management Services Division, Office of Program Planning and Fiscal Management, *Using Outside Consulting Services* 7 (1969).

In the preface to *Using Outside Consulting Services, supra* at 5, then Governor Daniel J. Evans said

This does not mean, however, that it is proper to use a consultant to do a job that a regular employee can do, or one that could be accomplished by resources available within other state departments, or one that calls for full-time continuous employment, or one organized to bypass competitive employment procedures. These devices are illegal under the State Civil Service System, they are wasteful and they destroy the morale of career specialists.

The employment of Walsh as a working art director and working chief designer for 9 years in a nonclassified consultant status was unauthorized and in direct contravention of the State Higher Education Personnel Law, the general purpose of which is

to establish a system of personnel administration for the institutions of higher education in the state which is

based on merit principles and scientific methods, and which governs the appointment, promotion, transfer, layoff, recruitment, retention, classification and pay plans, removal, discipline, and welfare of employees covered under this chapter.

RCW 28B.16.010, in part. As was said in *Herriott v. Seattle*, 81 Wn.2d 48, 61, 500 P.2d 101 (1972):

> The purpose of civil service is to establish a merit system of public employment in the matter of the selection, appointment, discipline and discharge of civil employees. *Gogerty v. Department of Inst.*, 71 Wn.2d 1, 4–5, 426 P.2d 476 (1967); *State ex rel. Voris v. Seattle*, 74 Wash. 199, 204, 133 P. 11, 4 A.L.R. 198 (1913). It is thought that elimination of the arbitrary employment procedures of the spoils system enables state, county, and municipal governments to render more efficient services to the public. *Civil Serv. Comm'n v. Foley*, 75 Ariz. 364, 371, 257 P.2d 384 (1953).

*See also Bellingham Firefighters Local 106 v. Bellingham*, 15 Wn. App. 662, 551 P.2d 142 (1976).

The classified service established by the Higher Education Personnel Law may not be circumvented by the retention of permanent consultants. *Cunningham v. Community College Dist. 3*, 79 Wn.2d 793, 489 P.2d 891 (1971). Miller testified that the Department of Publications would survive without Walsh; it should do so. Without him, there is a place for Osterlof, a career specialist in the classified service whom Miller, the department head, said had "proven to be a highly creative and disciplined professional in the field of graphic design."

Osterlof was laid off effective August 12, 1971. She must be reinstated in her former position and awarded the pay she would have received from the university since that date, RCW 28B.16.180, less any sums that she has earned elsewhere. *State ex rel. West v. Seattle*, 61 Wn.2d 658, 668, 379 P.2d 925 (1963).

Reversed and remanded for further proceedings consistent with this opinion.

SWANSON and ANDERSEN, JJ., concur.

Petition for rehearing denied September 27, 1977.

Review by Supreme Court pending May 3, 1978.